Randy DORMAN, Plaintiff–Appellant,

v.

BRIDGESTONE/FIRESTONE, INC., Defendant–Respondent.

No. 74371.

Missouri Court of Appeals,
Eastern District,
Division Five.

March 30, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 5, 1999.

Application to Transfer Denied
June 29, 1999.

John G. Simon & Jason D. Dodson, Gray & Ritter, P.C., St. Louis, for appellant.

Robert A. Horn, Blackwell Sanders Peper Martin LLP, Kansas City, Thomas L. Stewart, the Holloran Law Firm, St. Louis, for respondent.

KENT E. KAROHL, Judge.

Plaintiff, Randy Dorman (Dorman), appeals summary judgment for defendant, Bridgestone/Firestone, Inc. (Firestone). Dorman filed a petition for personal injury arising from injuries he sustained as a result of the separation of a truck wheel on June 17, 1991. The trial court granted Firestone's motion for summary judgment in a suit for strict product liability and negligence.

The motion for summary judgment and the judgment were based on a trial court conclusion that Dorman failed to offer evidence: (1) to support a finding Firestone was the manufacturer of the product; (2) to support finding that a defect existed at the time the wheel was sold; and, (3) to support finding a connection between the defect and Dorman's injuries. Dorman must offer such evidence to support a judgment against Firestone on the claim of product liability.

The relevant summary judgment facts are as follows. Dorman worked as a tire service technician for Tri–Star Tire at the time of his injuries. He was injured on June 17, 1991, as he attempted to repair a tire tube on a truck owned by defendant, Ray's Tree Service.[1] The tire and the wheel were removed from the truck prior to Dorman performing his work. He discovered a nail in the tube after he took the tire off the wheel. He replaced the tube and then re-assembled the tire and wheel. He began to inflate the tire without restraining it in a safety cage. During inflation, the side ring portion of the truck's split-rim wheel separated from the wheel base, struck him and caused personal injuries.

The truck wheel consisted of two components: a rim base and a side ring. Dorman produced the rim base for inspection, but the side ring was lost after the accident. The rim base was positively identified as a RH5° design rim base. Based on the inspection, Kelsey–Hayes Company, Hayes Wheels International, Inc.'s predecessor, was identified as the designer, manufacturer and seller of this rim base. The identification was possible because of certain markings and the design of the rim base, which was traceable to Kelsey–Hayes.

The RH5° concept originated and was designed by a Firestone engineer in the 1940s. Firestone gave the wheel the RH5° designation. Firestone holds the patent on the RH5° design. Kelsey–Hayes designed, developed, and patented the compression fit for the RH5° rim. Kelsey–

---

1. Dorman's petition named numerous defendants.

Hayes received its patent on the RH5° rim approximately the same time Firestone received its patent for the basic design of the RH5° rim. Kelsey–Hayes manufactured approximately one-half of the 16,000,000 + RH5° rim bases manufactured in this century.[2] Firestone also manufactured the RH5° rim base.

The "five degrees" in the design relates to a rim concept developed in World War II where the interference lip was changed from cylindrical to a five-degree angle. The continuous side ring and rim base connect in the center of the rim by a slight interference of the metal lip, which is less than one inch, on each piece. This center connection is unique to the RH5° design and is a major reason for the wheel's propensity to separate. At two points on the lip, crescent shaped spaces are ground out of the metal, which allows for pieces to be assembled and disassembled. The force of air pressure when a tire inner tube is placed on the rim pushes the two pieces together, which, in theory, keeps the rim assembled. This interference lip is the only thing restraining several thousand pounds of force of the compressed air in the tire.

This design prevents anyone who is servicing the wheel from being able to determine whether a proper lock between the two pieces has been achieved, whether before, during or after inflation. When the RH5° separates, the side ring is propelled off the rim base, as the rim base is mounted to the axle of the truck. The RH5° does not have a safety device, which would keep the pieces "locked" together.

When repair is necessary, there is standard protocol to be followed. Once disassembled, the connecting parts of the wheel are inspected for corrosion and, if present, are scraped or cleaned with a wire brush. A tireman must also determine that the pieces are not bent, worn or damaged to insure a solid fit between the re-assembled pieces. The wheel is assembled by, in effect, prying the side ring onto the rim base and hammering into place. After the new tube and tire are placed on the rim base, the side ring is placed on the wheel. The tireman attempts to determine that the ring is on properly by visual inspection and by hitting the wheel with a hammer. If necessary, the ring can be pounded with a hammer and held down by the tireman's feet.

The wheel design is conducive to corroding at the interference lip. The RH5° design allows water and other corrosive elements to become trapped between and around the metal lip, at the center of the connection, which in turn compromises the interference fit. Firestone recommends that tireman clean, scrape and use a wire brush to remove any corrosion. The manufacturers rely on servicemen in the field to determine if the wheel is in good enough condition to remain in service. Firestone has never issued a consumer notification that advises discarding the RH5° wheels once they reach a certain age. RH5° wheels have disengaged whether they are new, rusted, cracked or bent.

Hayes Wheels produced a list, generated in 1978, of prior incidents of RH5° separations. A senior product engineer from the product analysis department at Firestone testified he was personally involved in the investigation of approximately 100 cases involving RH5° separations in which the wheel injured or killed people.

On appeal, Dorman argues the trial court erred in granting summary judgment in favor of Firestone because substantial evidence existed to support finding: (1) Firestone designed and manufactured the product; (2) the product was defective and unreasonably dangerous at the time it was sold; and, (3) such defect caused Dorman's inju-

**2.** Hayes Wheels was an original defendant in this case. Dorman settled his claims with Hayes Wheels prior to the trial court's grant of summary judgment in favor of Firestone.

The actual rim base is often referred to as a "Kelsey–Hayes" rim rather than a Hayes Wheels' rim because it was manufactured by Hayes Wheels' predecessor, Kelsey–Hayes.

ries. Firestone submits the trial court properly granted its motion for summary judgment because Dorman failed to offer necessary threshold proof that Firestone manufactured, designed or distributed any truck rim product allegedly involved in Dorman's accident.

Firestone also argues we should dismiss Dorman's appeal for failure to comply with Missouri Court Rules 84.04(c), which requires a fair and concise statement of the facts, and 84.04(h), which requires page references to the legal file or transcript with respect to all statements of fact and argument. Here, some of Dorman's statements of fact do not comply with the dictates of the rule. However, generally they are in compliance in a complicated case. We foresee no resulting prejudice to defendant. We deny this portion of Firestone's motion.

We apply the standard of review as provided in *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371 (Mo. banc 1993). Summary judgment shall be entered if the motion and response both show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo.banc1993). The burden on a summary judgment movant is to show a right to judgment flowing from facts about which there is no genuine dispute. *Id.* at 378. A "genuine issue" exists where the record contains competent materials that support two plausible, but contradictory, accounts of essential facts. *Id.* at 382. The dispute must be real, not merely argumentative, imaginary or frivolous. *Id.* Once the movant has demonstrated that no genuine issue of material fact exists, the burden shifts to the non-movant to show that there is a genuine dispute as to the material facts supporting the movant's right to summary judgment. *Id.* at 381–82. Our review of the decision to grant summary judgment is

essentially de novo. *Id.* at 382. We review the record in the light most favorable to the non-moving party and accord it all reasonable inferences from the record. *Id.*

Section 537.760 RSMo 1994,[3] which codifies the Restatement 2d of Torts Section 402A, provides a cause of action for strict product liability when:

(1) The defendant, wherever situated in the chain of commerce, transferred a product in the course of his business; and

(2) The product was used in a manner reasonably anticipated; and

(3) Either or both of the following:

(a) The product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and the plaintiff was damaged as a direct result of such defective condition as existed when the product was sold; or

(b) The product was then unreasonably dangerous when put to a reasonably anticipated use without the knowledge of its characteristics, and the plaintiff was damaged as a direct result of the product being sold without an adequate warning.

Firestone did not plead as a ground for summary judgment that there are no available facts to prove Firestone designed, manufactured, sold, distributed or placed into the stream of commerce a defectively designed 2–piece wheel named the RH5°. Firestone did not argue any summary judgment facts to support a finding in opposition to Dorman's allegations that Firestone designed, manufactured and sold the side ring which was involved in the wheel separation, which injured Dorman. Rather, Firestone relied solely on summary judgment facts that may support finding co-defendant Kelsey–Hayes manufactured, sold and distributed the rim base produced for inspection in this case. Firestone did not plead that it did not design

3. All statutory references are to RSMo 1994 unless otherwise indicated.

the RH5° or the side ring involved in this case. There are summary judgment facts to support a finding it designed and manufactured the side ring.

■ Dorman offered a detailed and extensive response to Firestone's summary judgment motion. Specifically, Dorman argues material questions of fact as to whether Firestone designed, manufactured and sold the side ring. The summary judgment facts support a finding that Firestone designed the RH5° wheel, which consists of a rim base and a side ring. Expert testimony was offered with facts to support finding: (1) the side ring, even though lost, likely was a RH5° since it is difficult for other side rings to "mismatch" with a RH5° rim base; (2) Firestone was the only manufacturer of the RH5° side ring in the United States; (3) Kelsey–Canada[4] also manufactured RH5° side rings; and, (4) very few of Kelsey–Canada's side rings made it into the United States, as they were not distributed here and were only sold to automobile manufacturers in Canada. In the many claims for injury for RH5° wheel separations that experts Doug McIntyre, for Kelsey–Hayes, and Dennis Whalen, for Firestone, have inspected, they recall only seeing one or two Kelsey–Canada RH5° side rings in the US. Finally, the evidence supports a finding that Firestone side rings are regularly used with Kelsey–Hayes' rim bases.

The trial court entered an order and summary judgment as follows:

> Firestone contends that there is no evidence showing that it designed the wheel rim at issue in this case. The record indicates that the RH5 rim was introduced under that name by Firestone during World War II and that Hayes contributed to the design. Hayes' design contribution was the "interference" fit between the wheel rim and the side ring. The alleged defect in the design relates to the interference, in that the components do not adequately

connect. In their respective responses to Plaintiff's requests for admissions, both Hayes and Firestone denied designing the RH5 wheel rim. Hayes attributed the design to Firestone.
> However, there is no evidence that Firestone designed the component of the wheel rim that allegedly failed; rather, the evidence indicates that Hayes designed the interference fit that apparently failed to function. With respect to a product that contains multiple components and which is designed and manufactured by different entities, the defendant/designer must be linked with the overall design of the product or at least with the aspect of the design defect at issue. *Sperry v. Bauermeister, Inc.,* 804 F.Supp. 1134 (E.D.Mo.1992), *aff'd,* 4 F.3d 596 (8 th Cir.1993).

■ We find the trial court erred in granting summary judgment. Strict liability in tort applies to defective design cases. *Wilson v. Danuser Mach. Co., Inc.* 874 S.W.2d 507, 512 (Mo.App. S.D.1994). The inquiry is whether the product, because of its design, creates an unreasonable risk of danger to the consumer or user when put to its intended use. *Nesselrode v. Executive Beechcraft, Inc.,* 707 S.W.2d 371, 375–76 (Mo. banc 1986). Setting forth the necessary elements of an action for strict product liability, we first find that the summary judgment facts contain conflicting evidence on which manufacturer sold the product in the course of its business.

There is ample testimony Firestone sold the RH5° wheel. There are facts to support finding Firestone sold, at one time, both of the component parts. Only Firestone manufactured side rings in the United States. Douglas McIntyre, Kelsey–Hayes' expert, testified that Firestone made the side rings to be used with the Kelsey–Hayes' RH5° rim base. He indicated that a small number were made by Kelsey–Canada, but those were not sold in the US. If the Kelsey–Canada RH5° side ring was found in the US, it was likely

---

**4.** Kelsey–Canada refers to Kelsey–Hayes Canada.

after-market and not original equipment. However, McIntyre opined that more likely than not, the RH5° wheel, including the side ring, was original equipment on this truck. The truck was identified as a 1965 Ford and the RH5° wheel was last produced in 1972. Moreover, he concluded there are almost no Kelsey–Hayes' RH5° side rings in the US. Another expert testified that Firestone was the sole manufacturer of side rings. Dennis Whalen, an expert for the defense, testified that a Kelsey–Canada or Firestone side ring would properly be used with the rim base that was produced. He acknowledged that he has seen a Firestone side ring on a Kelsey–Hayes' rim base. If the court accepts this testimony as true, then the facts do not support a finding that Kelsey–Hayes sold the RH5° side ring in this case. A material issue of fact exists as to whether Firestone sold the side ring that separated and injured Dorman.

■ Second, the summary judgment facts contain conflicting evidence as to the defective design of the RH5° wheel. The trial court found that when multiple components of a product are designed and manufactured by different entities, the plaintiff has the burden to produce evidence linking the defendant to the overall design of the product *or* with that aspect of the design which failed. *Sperry*, 804 F.Supp. at 1134. A plaintiff meets this burden by providing competent expert testimony or additional evidence that the defendant's product was a substantial factor in causing the injury, thereby establishing the element of causation. *Hagen v. Celotex Corp.*, 816 S.W.2d 667, 671 (Mo. banc 1991); *Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241 (Mo. banc 1984) (held that the element of causation must be established as to each defendant sought to be held accountable).

The trial court erred when it found no evidence to support finding Firestone was linked with the overall design of the product. In fact, the testimony offered is replete with such evidence. Firestone holds the patent on the overall design. Kelsey–

Hayes holds the patent for the "improvement", which is the interference fit, but Firestone was adjudicated as the general design patent holder. Expert testimony established that Firestone's employee invented the RH5° designation in the 1940's. Thus, the requirement set forth in *Sperry* is met because Dorman produced evidence to link Firestone with the overall design. *Sperry v. Bauermeister, Inc.*, 804 F.Supp. 1134 (E.D.Mo.1992), *aff'd*, 4 F.3d 596 (8th Cir.1993). This creates a factual issue, which is genuinely disputed.

■ Dorman presented evidence to support finding the element of strict product liability that demands a showing of defective condition and unreasonable danger when it left the manufacturer's hands. There is testimony: (1) that the design of the RH5° relies on the slight interference of the metal lip on each of the rim base and side ring, and tremendous amounts of pressure to keep the two-piece wheel together; and, (2) this connection is susceptible to corrosion, inadequate fit and violent separation. Jack Campau, an expert for Dorman, testified that this "interference fit" begins to rust as soon as it is put into use. A tireman who services this wheel must attempt a proper connection, but can never be sure of success because the design does not allow full view of the connection.

Dorman also presented facts that show Firestone subsequently developed a potentially safer design, the XL. Kelsey–Hayes subsequently designed the AR. Kelsey–Hayes' advertising, produced in this case, touts the advantages of the AR rim over the RH5° because of a "tighter, truer, more accurate press fit." It claims the two-piece continuous side rings, similar to the one at issue in this case, are "harder to get off when you want them off – but – more likely to come off when you don't!"

There is evidence to support a finding that the National Highway Traffic Safety Administration investigated a recall because of the inherent safety defects in the

rim and that Firestone agreed not to produce any more RH5° components. Firestone's expert, Dennis Whalen, testified in the recent case of *Rousseau v. Bridgestone/Firestone, Inc.*, Circuit Court of Jackson County, No. , that he conducted a test of a new and serviceable RH5° wheel. He took the proper components, properly assembled them and began to inflate the tire. At some point after inflating to 20 PSI, the side ring separated from the rim base and the tube burst. The normal operating pressure is somewhere between seventy and ninety PSI. Whalen achieved the explosive separation after one attempt.

▪ Firestone does not admit defective design and counters that Dorman should have recognized the useful life of this wheel had expired. They submit that a manufacturer may not be held liable for ordinary wear and tear on the product. *Glass v. Allis–Chalmers Corp.*, 618 F.Supp. 314, 316 (E.D.Mo.1985). The evidence produced includes expert testimony that an RH5° wheel corrodes upon first use. However, some experts opined the rim base involved in this accident was corroded, rusty, deteriorated and should not have been used. Thus, a disputed material issue of fact remains. Additionally, Firestone argues that the condition of the missing side ring is unknown and would require the jury to rely on impermissible speculation. *Crump v. MacNaught P.T.Y. Ltd.*, 743 S.W.2d 532, 534 (Mo.App.1987). Such a focus is misplaced. While the component parts of the RH5° wheel are significant evidence, the crux of this case is the defect in the overall design. Moreover, the failure to produce a component part is not legally fatal to a plaintiff's case. *Brissette v. Milner Chevrolet Co., Inc.*, 479 S.W.2d 176, 177 (Mo.App.1972). It is likely there will be opposing expert witnesses, subject to cross-examination, who have different opinions on every issue from who manufactured the injury-causing product to the defect in the overall design of the product.

Third, Dorman submits that the wheel in this case was used as reasonably anticipated. In fact, there is no dispute that the RH5° wheel was being used as a wheel, which is the normal practice. The summary judgment facts indicate that Dorman disassembled, inspected and re-assembled the wheel just prior to the accident in a manner that could have been anticipated.

▪ Finally, the summary judgment facts contain conflicting evidence on the real reason for the wheel's separation. Dorman claims that he was injured as a direct result of the defective condition that existed when the RH5° was sold by reason of design defect. Pursuant to this theory, he must prove there has been no substantial change in the condition of the RH5° wheel involved in the accident. *Winters v. Sears, Roebuck and Co.*, 554 S.W.2d 565 (Mo.App.1977). If a jury could infer the existence of a defect from evidence which points "reasonably to the desired conclusion and tend(s) to exclude any other reasonable conclusion", then plaintiff has made a submissible case. *Hale v. Advance Abrasives Co.*, 520 S.W.2d 656, 658 (Mo. App.1975). The jury can determine that an injury was caused by a design defect, rather than other causes, when a qualified expert testifies that the defect was the more reasonable cause. *Winters*, 554 S.W.2d at 570.

Dorman argues that the trial court erred when it misconstrued his theory of the defect. The court held "the alleged defect is the tendency of the components to corrode." Dorman's response is, while the tendency to corrode may be part of the reason the RH5° is defective, the primary defect is the design of the center connection fit.

Dorman offered the following evidence. Campau, plaintiff's expert, testified to an inherent defect in the design and that there was no post-sale alteration which caused the separation. Firestone's expert conducted a test with the RH5° wheel, which resulted in an explosive separation after only one attempt. There was evi-

dence to support finding that anyone servicing an RH5° wheel could not visually assess proper assembly because the design obstructed the view of the interference fit. Dorman testified that he inspected both pieces of the wheel immediately prior to assembly and inflation of the tire. He thought the wheel seemed in good shape and required no rust to be cleaned off. Moreover, at the time of the accident he knew excessive corroding would inhibit a proper fit and it would be necessary to discard such a wheel. He opined that this wheel should remain in service. Firestone offered evidence that Dorman should have banned this wheel from service. An expert testified the RH5° rim base produced was so deteriorated that Dorman should have recognized it as unserviceable. The conflicting material facts on the element of causation do not support a finding of summary judgment. There is substantial evidence from which a jury could conclude either the design of the RH5° is responsible for the injury-producing separation or it was not. Hence, the foundation for summary judgment is lacking.

 The petition also alleged a cause of action for negligence. Specifically, Dorman alleged Firestone breached its duty to warn of a known and specific design defect that could cause the split rim to disengage from the wheel with great force while being used in a manner reasonably anticipated. Recovery on a strict liability theory in a defective design case dictates that a plaintiff must demonstrate the product, as designed, is unreasonably dangerous and therefore defective. Strict

liability and negligence, although distinct legal theories, may rely on the same operative facts to support recovery. *Spuhl v. Shiley, Inc.*, 795 S.W.2d 573, 577 (Mo.App. 1990). However, unlike strict product liability, the defendant's conduct is the focus. *Nesselrode*, 707 S.W.2d at 375.

 The current negligence standard in Missouri sets forth that a seller of a product who neither knows nor has reason to know the product is dangerous is not liable in a negligence action for harm caused by the product's dangerous condition because of the seller's failure to discover the danger by an inspection or test of the product before selling it. Restatement (Second) of Torts, section 402 (1965); *See also, Welkener v. Kirkwood Drug Store Co.*, 734 S.W.2d 233, 241 (Mo.App. 1987); *Willey v. Fyrogas Co.*, 363 Mo. 406, 251 S.W.2d 635, 639 (1952).[5]

 However, if the defect is such that a reasonably prudent seller should have discovered it before selling the product to the consumer, the seller may be held liable for the injuries caused by the defect. *Welkener*, 734 S.W.2d at 241. Based on the operative summary judgment facts, Dorman produced evidence to support finding a submissible cause of action in negligence.

We reverse and remand.

ROBERT G. DOWD, Jr., C.J. and ROBERT E. CRIST, Senior Judge, concur.

5. In *Newman v. Ford Motor Co.*, 975 S.W.2d 147, 152–53 (Mo. banc 1998), our Supreme Court noticed the Restatement (Third) of Torts: Product Liability, section 2(b), which abandons the Second Restatement's "consumer expectations" test in favor of a "risk-utility" test. It stated:

Under the Third Restatement's test, a product is defectively designed "when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller ..., and the omission of the

alternative design renders the product not reasonably safe...." Restatement (Third) of Torts: Product Liability, section 2(b). As the amicus Product Liability Advisory Council, Inc., notes, under this test a plaintiff must prove that: "(1) a reasonable, safer, alternative design was available at the time of sale; and (2) omission of the safer alternative rendered the product 'not reasonably safe.' "

It did not, however, adopt the standard of the Restatement (Third) of Torts: Product Liability, section 2(b).