John MATHES, Natural Father of Jacob Mathes, and, Natural Son of John Mathes and Shirley Mathes, Respondents,

v.

SHER EXPRESS, L.L.C., et al, Defendant,

Ford Motor Company, Appellant.

No. WD 65524.

Missouri Court of Appeals, Western District.

June 20, 2006.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 1, 2006.

Application for Transfer Denied Sept. 26, 2006.

***ORDER***

PER CURIAM.

Michael Smothers appeals from his conviction by jury of one count of stealing,

98

Robert Thomas Adams, Kansas City, and Paul Anthony Williams, Kansas City, Julie Ann Shull, Kansas City, for Appellant.

James Kent Emison, Lexington and Michael W. Blanton, Kansas City, Edward D. Robertson, Jr., Jefferson City and William George Ruby, House Springs, for Respondent.

RONALD R. HOLLIGER, Judge.

Ford Motor Company ("Ford") appeals a wrongful death judgment in this case involving a chain collision that resulted in the deaths of John Mathes's son and parents. Mathes claimed that the defective design of decedents' Ford F–150 pickup truck, and more specifically the fuel tank system, caused their deaths by fire. Ford asserts four points of error: (1) Mathes failed to make a submissible case, because no substantial evidence showed that the alleged product defects in the F–150 caused the deaths; (2) the jury instruc-

tions failed to use a general verdict form, improperly stated the law regarding causation, included roving commissions in the verdict directors, deviated inappropriately from Missouri Approved Instructions, and presumed a fact that should have been left to the jury to decide; (3) certain expert testimony should have been excluded as irrelevant, unreliable, or previously undisclosed; and (4) a photograph of the accident scene and a poem should have been excluded as irrelevant, cumulative, or inflammatory. We affirm.

### Facts

On Saturday, October 9, 1999, eight-year-old Jacob Mathes was seated between his grandparents, John and Shirley Mathes, in their Ford F–150 pickup truck, westbound on I–70, headed for a camping trip. For ease of understanding, we refer to John, Jacob, and Shirley by their first names. We refer also to Jacob's mother, Linda, by her first name. The named plaintiff, John Mathes—son of John and Shirley and father of Jacob—we refer to as "Mathes," to distinguish him from his deceased father.

The road was wet and two vehicles in the *eastbound* lanes lost control: a tractor-trailer combination (a "semi") owned by Sher Express, and a Geo Tracker. The semi struck the Geo, both vehicles crossed into the median, and the semi ended up on its side, blocking both lanes and the shoulder of *westbound* I–70, on which the Mathes F–150 was traveling. A Ford Taurus traveling alongside the F–150 avoided any collision and ended up in the ditch. Towing a camper-trailer, the F–150 swerved toward the shoulder but failed to evade the semi. At a speed somewhere between thirty and fifty miles per hour, the F–150 struck the trailer portion of the semi on the road shoulder and the camper-trailer jack-knifed toward the left side of

the F–150, leaving the tail of the F–150 elevated about one foot higher than its usual position. The front-right portion of a GMC Jimmy driven by Tim Cain then struck the left half (approximately) of the tail of the F–150. Because the F–150 tail was elevated, the Jimmy rode under the F–150, forcing the F–150's rear axle toward its fuel tank. The fuel tank ruptured, spilling gasoline that Mathes claimed caught fire and killed his decedents.

When the Jimmy struck the F–150, the Jimmy's driver-side door was jammed shut with its window intact, forcing Cain to escape the Jimmy out the passenger-side window, which was shattered. The tail of the F–150 and the front-passenger side of the Jimmy were engulfed in orange flames, which Cain climbed through to escape. He ran up the side of the ditch, away from the wreckage, then immediately returned to the F–150 to try to open it. Flames coming from under the rear of the F–150 burned Cain's leg while he tried unsuccessfully for about thirty seconds to open the F–150's passenger door or break its window. Jeff Smith, a passenger in the Taurus, also approached the F–150 to try to open it, but the fire from under the truck became too intense and Smith and Cain retreated. Smith observed a second orange fire in the engine compartment of the F–150. Smith also saw and smelled an unignited flow of gasoline on the ground from the rear of the F–150, flowing toward the flames. Some time after Cain and Smith retreated, between two and five minutes after the collision, the vapors from that flowing gasoline exploded and the F–150 was enshrouded in flames eighteen feet high. Diesel fuel from the semi then caught fire, ignited by the fires from the F–150.

John, Jacob, and Shirley died in the F–150; the precise cause of death was the

central dispute at trial. Sher Express admitted causing the collision. Mathes persuaded the jury, however, that John, Jacob, and Shirley did not die as a result of the collision impact but instead in a fire fuelled by the gasoline from the ruptured F–150 gas tank, and that the rupture was the result of Ford's unreasonably dangerous fuel system design. The alleged design defects were (1) failure to properly shield the gas tank, and (2) pointed edges on the anti-lock-brake sensor guards, located on the forward edge of the rear-axle differential, which tore a gouge in the gas tank. Ford argued that the decedents died on impact or, alternatively, that Mathes failed to prove the F–150 gasoline fire killed them, as opposed to one of the other fires burning in the vicinity of the F–150. Ford also argued that the fuel system design was not defective.

To prove the cause of death, both sides presented lay and expert witnesses who testified about the condition of the occupants of the F–150 in the minutes after the collision, the nature and sources of the fires at the scene, the force of the collision, and the condition of the F–150 after the wreck. Several witnesses testified specifically about whether the decedents had survived the impact and were thus trapped alive in the burning F–150. Aaron Valentine, Derek Valentine, and Mark Catching did not see the collision, but came upon it before the explosion occurred. They testified that they heard voices from inside the F–150 yelling for help prior to the explosion, and that the cries for help terminated with the explosion. Mr. Cain, who drove the Jimmy, testified that he did not recall seeing any motion inside the F–150 while he tried to open its doors to help its occupants out immediately after the collision. Cain explained, however, that he was unsure whether he remembered no motion inside the pickup because the F–150 cab "was full of smoke or whether it's some-

thing [he] blocked out" of his memory. Mr. Smith, the passenger in the Taurus, testified that no one inside the F–150 moved when he approached it to try to open its doors in the moments after the crash. But he also testified that he "didn't get a look at them" and that the F–150 cab was full of smoke.

Elizabeth Lowry, driver of the Taurus, testified that she could see people in the F–150 after the collision and before the explosion, that they were not moving, and that they were "slumped over." However, a photo of the inside of the F–150 after the explosion and after the fires were extinguished shows that both John and Jacob were sitting upright against the backs of their seats, no longer slumped over. Dr. Joseph Burton, a medical doctor specializing in forensic pathology, biomechanics, and kinematics, testified for Mathes that water pressure from the fire hoses would not likely have moved the bodies from a slumped to an upright position. He explained that fire hoses sometimes knock people down, but he had not heard of fire hoses setting people upright. He opined that the change in position indicated they were alive after the collision and had moved of their own volition, but burned to death in the fire. Dr. Burton also testified that the G-forces the decedents suffered from deceleration on impact were not enough to kill them and that the F–150 cab was not severely crushed.

Dr. Burton and Dr. Thomas Bennett, who testified for Ford, jointly performed autopsies of the victims approximately a year after death. Dr. Burton testified that autopsy on the exhumed bodies is almost as informative as autopsy would have been in the few days after death. He concluded that, consistent with the survivability of the G-forces, the bodies showed no fatal impact-injuries. He further explained that the decedents' airways were decomposed

to such an extent that it was impossible to determine whether they had inhaled soot. Dr. Bennett opined, in contrast, that the impact injuries could be sufficiently serious to cause death, or could be survivable. He testified that the absence of soot in the airways and lungs indicated that the decedents had stopped breathing before the fire reached them. Both doctors agreed that the absence of carbon monoxide in the blood did not prove whether death occurred before the fire, or after. The jury concluded that John, Jacob, and Shirley all died from fire resulting from a ruptured fuel tank on the F–150, and that the fire was caused by Ford's defective fuel system design.

## Discussion

### I.

In its first point on appeal, Ford argues that the trial court erred in denying Ford's motions for judgment notwithstanding the verdict, because Mathes failed to make a submissible case. Ford argues that no substantial evidence showed that the alleged product defects in the F–150 *caused* the deaths.

 "A defendant is entitled to a judgment notwithstanding the verdict only when the plaintiff fails to make a submissible case. To make a submissible case, a plaintiff must present substantial evidence for every fact essential to liability. Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case." *Porter v. Toys "R" Us–Delaware, Inc.,* 152 S.W.3d 310, 315 (Mo. App.2004) (citations and internal quotation marks omitted). "In determining whether a plaintiff has made a submissible case, we view the evidence and all reasonable inferences therefrom in the light most favorable to plaintiff. We will reverse the verdict of the jury only where there is a complete absence of probative fact to support the jury's conclusion." *LaRose v. Washington Univ.,* 154 S.W.3d 365, 369 (Mo.App.2004) (citations and internal quotation marks omitted). "The plaintiff's evidence is presumed to be true. Any of the defendant's evidence that does not support the plaintiff's case is disregarded." *Porter,* 152 S.W.3d at 315–16 (citations omitted).

 Ford alleges that Mathes presented no substantial evidence of causation. A plaintiff proves causation in a product defect case "by providing competent expert testimony or additional evidence that the defendant's product was a substantial factor in causing the injury." *Dorman v. Bridgestone/Firestone, Inc.,* 992 S.W.2d 231, 237 (Mo.App.1999). Here, Mathes presented eyewitness and expert testimony establishing that a fire fueled by gasoline from the F–150 killed John, Jacob, and Shirley. The F–150's fuel tank was indisputably ruptured. Mr. Smith testified that gasoline was flowing from the rear of the F–150 and that the explosion sounded like a gasoline-vapor explosion, which both Smith and fire expert William Bush explained makes a peculiar "whoosh" sound. Smith explained that the flow of gasoline remained unignited prior to the explosion, and that the flowing gasoline then produced flames eighteen feet high, engulfing the F–150. Mr. Bush explained that the characteristics of the fire, as described by Smith, match the characteristics of a gasoline fire, as opposed to a fire that would be produced by other automobile fluids or diesel. Bush further explained that because gasoline vapors are heavier than air, the gasoline could have vaporized for several minutes and hung close to the ground before the vapors reached a flame and ignited, consistent with the explosion's occurrence two to five minutes after the collision.

Ford stresses that for the fire to have killed the decedents, they would need to have initially survived the collision. We agree. Mathes offered the testimony of three eyewitnesses who said they heard cries for help from within the F–150 prior to the explosion, and that the cries then stopped. Dr. Burton testified that none of the decedents' collision injuries were severe enough to kill them. Even Ford's own expert conceded that the collision injuries were potentially survivable. Dr. Burton also explained that the lack of soot in decedents' airways did not mean that fire was not the cause of death, because the autopsy of the exhumed bodies took place a year after the accident, when the airways were too decomposed to reveal the presence of soot. Dr. Burton did find soot in John's throat and Jacob's nasal passages. Dr. Burton explained that, in addition to burn injuries, fire can kill a person by inducing a person's airway to shut down, starving the body of oxygen. Fire can also cause a person's body to overload on adrenaline and cortisol, causing the heart to stop, Dr. Burton explained.

Dr. Burton additionally pointed out that one eyewitness saw the decedents "slumped over" in the F–150 immediately after the collision, but photographs taken after the fires were extinguished showed that the bodies were seated upright, indicating that the decedents had moved of their own volition after the collision. We find these facts are substantial and would enable the jury to conclude that the fire engulfing the F–150 was a gasoline fire fueled by the F–150's ruptured gas tank, and that fire killed the decedents.

Ford additionally argues that Mathes failed to make a submissible case because he failed to prove that "but for" the gasoline fire, John, Jacob, and Shirley would have survived. Mathes responds that the strict "but for" test does not apply in those circumstances "involving two independent torts, either of which is sufficient in and of itself to cause injury, i.e., the 'two fire' cases." *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 862–63 (Mo. banc 1993). This case is an example of a "two fires" case in that it literally involves the combination and interaction of several different fires. This case differs from the exemplary "two fires" case, however, in that no evidence established that the other fires would necessarily have killed the decedents. On the evidence presented, the jury could conclude that but for the fire fueled by the F–150 gas tank rupture, John, Jacob, and Shirley would have been safely rescued from the pickup. Ford points to no evidence to the contrary, relying instead on pure speculation about potential consequences of the other fires. Nevertheless, even if we assume that the other fires would necessarily have killed the decedents, the "two fires" rule dictates that Ford remains responsible. Point denied.

## II.

In its second point on appeal, Ford alleges several errors regarding the jury instructions: (1) the verdict forms allowed the jury to render verdicts against Ford for negligence and strict liability separately, in violation of the requirement of a "general" verdict form; (2) the verdict directors erroneously allowed the jury to consider the combination of Ford's and Sher Express's contributions to the cause of decedents' deaths; (3) the negligence verdict directors submitted a "roving commission" to the jury and deviated from MAI; and (4) the damage instructions presumed a fact that should have been left to the jury. We reject all of Ford's arguments.

We first address Ford's challenge to the verdict forms. Rule 70.01 declares that

jury instructions in civil trials will be approved by order of the Missouri Supreme Court. "Whenever Missouri Approved Instructions contains an instruction applicable in a particular case that the appropriate party requests or the court decides to submit, such instruction shall be given to the exclusion of any other instructions on the same subject." Rule 70.02(b). The party with the burden of proof *must* submit proposed instructions, and any party *may* propose instructions. Rule 70.02(a). All proposed instructions must be in writing. *Id.* The court may instruct the jury even without the request of a party. *Id.* Subject to timely objection, an instruction that violates Rule 70.02 is presumed erroneous, but prejudice must be found by the court. Rule 70.02(c); *Hudson v. Carr*, 668 S.W.2d 68, 71 (Mo. banc 1984) ("It is not enough to show erroneous deviation unless prejudice also appears."). A verdict form, however, is not an "instruction," but merely "the medium to record the decision of the jury." *Davis v. Stewart Title Guar. Co.*, 726 S.W.2d 839, 857 (Mo.App.1987).

In a case involving more than two parties or multiple claims, MAI 2.00 [1996 Revision] sets forth guidelines for "packaging" jury instructions, with a separate "package" of instructions for each "claim." "In most instances, the case should be packaged so that the claim for damages of each party asserting a claim for damages will be covered by a separate package." MAI 2.00(E) [1996 Revision]. Thus, a separate package may properly be used for each plaintiff asserting a distinct claim for damages. In this case, MAI 2.00 was properly applied so that a separate package of instructions was given to the jury for each decedent, John, Jacob, and Shirley. That is, each decedent presents a separate "claim" for death.

■ However, a single plaintiff's claim against multiple defendants or based on multiple theories of liability should generally be contained within a single package:

If plaintiff A is proceeding on alternative theories of negligence and strict liability, the verdict directors for both such theories would be included in the same package. If plaintiff A is making his claim against both defendant X and defendant Y, the verdict directors against both defendants would be included in the package.

*Id.* In some cases, where different theories of liability contain distinct elements of damages, separate packages may be appropriate for each liability theory, though MAI "takes no position requiring a particular approach in all such cases." MAI 2.00(G) [1996 Revision]. In this case, three packages of instructions were given, one for each decedent. Each decedent's instruction package included his or her claims against both Ford and Sher Express, and each package properly instructed on negligence and strict liability in separate verdict directors.

■ Each of the three instruction packages concluded with a single verdict form. Each verdict form contained three paragraphs. The verdict form for Shirley Mathes, for example, read as follows:

Part I . . . On the claim of Plaintiff John G. Mathes for the death of Shirley Mathes based on product defect against defendant Ford Motor [C]ompany, we, the undersigned jurors, find in favor of: [blank for verdict] . . .

Part II . . . On the claim of Plaintiff John G. Mathes for the death of Shirley Mathes based on negligence against defendant Ford Motor Company, we, the undersigned jurors, find in favor of: [blank for verdict] . . .

Part III . . . On the claim of Plaintiff John G. Mathes for the death of Shirley Mathes based on negligence against de-

fendant Sher Express Trucking Company, we, the undersigned jurors, find in favor of: [blank for verdict] . . .

Ford argues that the first two parts of the verdict form improperly gave Mathes two chances to find against Ford, in contravention of Rule 71.02, which requires a "general verdict."

We disagree. Rule 71.02 states, "In every issue for the recovery of money only, or specific real or personal property, the jury shall render a general verdict." This was a case for money only, so a general verdict was required. Rule 71.01 defines the two types of verdicts a jury may render:

> The verdict of a jury is either general or special. A general verdict is one by which the jury pronounces generally upon all or any of the issues, either in favor of the plaintiff or defendant, and includes a verdict wherein the jury returns a finding of the plaintiff's total damages and assesses percentages of fault. A special verdict is one by which the jury finds the facts only, leaving the judgment to the court.

The verdict form provided to the jury in this case asked the jury to decide all or any of the issues, not the facts only, so it was a general verdict. At oral argument, Ford cited *Chambers v. McNair*, 692 S.W.2d 320 (Mo.App.1985), for the proposition that it is improper to allow the jury to render "separate" verdicts. But *Chambers* is inapplicable, because it involved a separate verdict *form* for each *defendant*, not a separate *paragraph* for each *theory of liability*. 692 S.W.2d at 324. The jury in *Chambers* rendered duplicate verdicts, one against each defendant, resulting in a double recovery of damages for the plaintiff. *Id.* at 325. Here, in contrast, the verdict forms duplicated nothing; they merely separated Mathes' two theories of liability, and did not present multiple

forms for the different liability theories, only separate paragraphs. Such division of the ultimate issues to be decided by the jury fits squarely within the dictates of Rule 71. There was no risk the jury could render multiple damage awards.

■ Mathes' proposed verdict form, used by the trial court, looked in part to MAI 35.15 [1996 Revision], which is an illustration of an instruction package. MAI illustrations are just that, illustrations, and they do not carry the authority of the approved instructions. MAI 35.00 [1998 Revision] ("If any conflict exists between an instruction and an illustration, the court-approved instruction governs."). Illustration 35.15 applies to a fact pattern in which multiple defendants are sued for negligence, one of the defendants is also sued for strict liability, comparative fault is pled, and apportionment of fault among defendants is sought. Those facts apply in part in this case, except comparative fault was not pled and apportionment of fault among defendants was not sought.

Thus, the only distinctive element of MAI 35.15 that Mathes employed was the division of negligence and strict liability. This division is necessary in MAI 35.15 because not all defendants in the illustration are sued for strict liability; thus, the strict liability verdict is rendered in one part, and negligence is rendered (and apportioned among the parties) in a second part. Here, the division in the verdict form between negligence and strict liability may not have been strictly necessary; the jury could have been asked to find for Mathes or Ford on a claim "for death," as Ford proposed. But because negligence was pled against both Ford and Sher Express and strict liability was pled only against Ford, the liability theory division on the verdict form clarified the questions for the jury. In this way, the verdict forms matched the verdict directors. We

have previously approved delineating the issues presented in a verdict form "in a manner consistent with the [verdict directors] on the case." *Davis*, 726 S.W.2d at 857.

Ford rightly points out that 35.15 "may not be used where the comparative fault of the plaintiff is not in issue in the negligence claim." MAI 35.15 Committee Comment [1996 Revision]. At this time, however, no MAI verdict form or illustration presents (or has ever presented) the precise combination of parties and liability theories present in this case, so Ford cannot be heard to complain that Mathes failed to proffer one. Ford's own proposed verdict form, modeled on MAI 36.12 [1980 Revision], is for a case involving punitive damages, and not involving multiple theories of liability, making it also inapplicable to this case without eliminating the references to punitive damages.

> Where an MAI must be modified to fairly submit the issues in a particular case, or where there is no applicable MAI so that an instruction not in MAI must be given, then such modifications or such instructions shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts.

Rule 70.02(b). A verdict form is not an instruction. But regardless of whether or not Rule 70.02 applies to a verdict form, Mathes' proposed form accurately posited the issues to be determined by the jury on each theory of liability, and was, therefore, properly utilized by the trial court. The verdict form used would also have the potentially salutary purpose of avoiding a retrial in the event that some error or insufficiency of evidence was found in only one of the verdict directing theories.

Ford's second jury instruction argument is that the strict liability verdict directors erroneously allowed the jury to consider the combination of Ford's and Sher Express's contributions to the cause of decedents' deaths. Ford argues that the MAI 19.01 modification to the verdict director was improper. We disagree. The relevant paragraph of the verdict director for decedent Shirley Mathes, for example, succeeds a paragraph asking the jury to decide whether the product was defective, and reads as follows:

> [S]uch defective condition as existed when the 1997 F–150 was sold either directly caused the death of Shirley Mathes or combined with the acts of defendant Sher Express to directly cause the death of Shirley Mathes.

Ford argues that because Sher Express admitted its negligence, Sher Express is solely liable, even in a so-called "crashworthiness" case like this. Ford cites *Polk v. Ford Motor Co.*, 529 F.2d 259, 268 (8th Cir.1976), for the proposition that the defendant who caused the accident is liable for all injury, even the enhanced injuries caused by the defective product of another defendant. Like this case, *Polk* involved a car wreck that produced only non-fatal impact injuries, but a person trapped in the car burned to death because of Ford's defectively designed fuel system. *Id.* at 263. *Polk* is an accurate statement of the law of joint and several liability as it applies to Sher Express, but it provides no relief for Ford.

Ford's arguments fail to understand either the principles of joint and several liability or the proper use of MAI 19.01. Ford is correct that Sher, as the original tortfeasor, is responsible for all of the damage, including any caused by a foreseeable subsequent tortfeasor (e.g. Ford). *Polk*, 529 F.2d at 268. This is a principle of long standing and has nothing to do particularly with product defect or crashworthiness cases. Under this principle, a subsequent tortfeasor (e.g. Ford) is

responsible only for the damage caused by its tortious conduct. *Id.* Thus, the original tortfeasor and subsequent tortfeasor are jointly and severally liable for the additional damage caused by the second tortfeasor. This is an essential element in the determination of liability for lack of crashworthiness as a result of an auto's product defect; but the underlying principle does not arise from product defect law but from long standing principles of foreseeability and causation. Ronald R. Holliger & Susan L. Dill, *Comparative Fault, Strict Liability & Crashworthiness Cases,* 41 J. Mo. Bar 217, 222–23 (1985) (citing *Polk* and stating, "Adoption of the crashworthiness doctrine merely extended well understood and accepted general tort principles to the series of events [by consecutive tortfeasors]").

▮▮▮▮▮ Ford's argument ignores the single indivisible injury rule which has existed in Missouri since at least *Glick v. Ballentine Produce, Inc.,* 396 S.W.2d 609, 612–13 (Mo.1965). Under this rule, where the injury (such as death) is indivisible, the original and subsequent tortfeasor are treated as jointly and severally liable for the whole injury if they both contributed in any part to the injury:

> According to the great weight of authority, where the concurrent or successive negligent acts or omissions of two or more persons, although acting independently of each other, are, in combination, the direct and proximate cause of a single injury to a third person, and it is impossible to determine in what proportion each contributed to the injury, either is responsible for the whole injury, even though his act alone might not have cause the entire injury, or the same damage might have resulted from the act of the other tortfeasor, and the injured person may at his option or election institute suit for the resulting damages against any one or more of such tortfeasors separately, or against any number or all of them jointly.

*Id.* at 613. This doctrine has been applied in crashworthiness cases. *See, e.g., Richardson v. Volkswagenwerk, A.G.,* 552 F.Supp. 73, 81–82 (W.D.Mo.1982). Thus, if the jury believed that product defect caused the fire that killed decedents, Ford is jointly and severally liable for the entire indivisible injury—the death—and MAI 19.01 was appropriate. In a case of joint and several liability the language in MAI 19.01 cannot be subject to any meritorious attack.

Even absent application of joint and several liability principles, Ford's argument must fail. MAI 19.01 is to address situations that have potentially multiple causes. These causes need not even involve another tortfeasor but may simply be, for example, a pre-existing medical condition. *Schiles v. Schaefer,* 710 S.W.2d 254, 267 (Mo.App. E.D.1986) (applying MAI 19.01 and citing *Glick*). The applicability of MAI 19.01 beyond cases involving joint tortfeasors is highlighted by the change in 1986, when the title of the instruction was changed from "Verdict Directing Modification—Joint Tortfeasors" to "Verdict Directing Modification—Multiple Causes of Damage." MAI 19.01 Committee Comment (1995 New). "Multiple Causes" includes successive, not merely joint, tortfeasors. There was no error in the use of the 19.01 modification.

As we stated above, "Whenever Missouri Approved Instructions contains an instruction applicable in a particular case that the appropriate party requests or the court decides to submit, such instruction shall be given to the exclusion of any other instructions on the same subject." Rule 70.02(b). Here, Mathes proposed MAI 19.01 [1986 Revision] for the causation paragraph in the strict liability verdict directors. MAI

19.01 [1986 Revision] explains that it applies "[i]n a case involving two or more causes of damage," because "the 'direct result' language of [the causation paragraph in the standard verdict director] might be misleading." In this case, Mathes alleged that the acts of Sher Express and Ford combined to cause the deaths. MAI 19.01, therefore, applies.

Ford argues that MAI 25.04 [1978 Revision], the verdict director for strict product liability, should have been used in its standard form, without MAI 19.01 for the causation paragraph. But MAI 25.04 uses the same causation language that MAI 19.01 is intended to replace in cases like this. *Eagleburger v. Emerson Elec. Co.*, 794 S.W.2d 210, 224 (Mo.App.1990). As noted in *Eagleburger*, "MAI 19.01 does not state its use is limited to negligence cases.... Damage can be caused by a defective product, not just by negligence." *Id. Polk*, cited by Ford, agrees in relevant part that the verdict director's causation paragraph properly addressed defendants' combined acts: "[A]cts by others could set in motion a chain of circumstances under which the defective condition might produce or cause the enhanced injuries." 529 F.2d at 268. This is the kind of causal chain contemplated by MAI 19.01, and the trial court correctly instructed the jury.

 Ford argues, in its third challenge to the jury instructions, that the negligence verdict directors submitted a "roving commission" to the jury. The relevant text of the negligence instruction for Shirley Mathes (for example) states,

In Verdict A, on Plaintiff's claim for the death of Shirley Mathes based on negligence, your verdict must be for Plaintiff against defendant Ford Motor Company if you believe:
... Third, either:
the 1997 F–150 fuel tank was at risk for puncture due to lack of shielding, or

the 1997 F–150 fuel tank was at risk for puncture due to the design of the guards surrounding the anti-lock brake sensor, and

Fourth, defendant Ford Motor Company in any one or more of the respects submitted in paragraph Third failed to use ordinary care to design the fuel system of [the] 1997 F–150 to be reasonably safe; and

Fifth, such failure either directly caused the death of Shirley Mathes or combined with the acts of defendant Sher Express to directly cause the death of Shirley Mathes.

Ford contends that the phrase "at risk" constitutes a roving commission. We disagree.

 Ford rightly indicates the rule that, "[i]f an instruction fails to advise the jury what acts or omissions of the party, if any, found by it from the evidence[ ] would constitute liability, the instruction is a roving commission." *Coon v. Dryden*, 46 S.W.3d 81, 92–93 (Mo.App.2001). Stated in the converse, "When ... a plaintiff's theory of the case is supported by the evidence and the instruction submits ultimate facts which define for the jury the plaintiff's theory of negligence, the instruction is not a roving commission." *Lindquist v. Scott Radiological Group, Inc.*, 168 S.W.3d 635, 653 (Mo.App.2005). Here, the instruction precisely identifies Ford's alleged acts and Mathes' theory of liability. Contrary to Ford's argument, the instruction does not ask the jury to contemplate some unspecified hypothetical risk the F–150 fuel system *may* have posed. Rather, it asks the jury specifically whether improperly designed shielding or anti-lock-brake guards created a risk of puncture, and whether that improper design caused decedents' deaths. The instruction adequately submits ultimate facts which de-

fine the plaintiff's theory of negligence; it is not a roving commission.

 Ford additionally argues that the negligence verdict directors deviated from MAI. Ford did not raise this objection at trial and, thus, failed to preserve this argument for review. Rule 70.03; *Coon*, 46 S.W.3d at 92.

Ford's fourth and final challenge to the jury instructions is that the damages instruction presumed a fact that should have been left to the jury to decide. The damages instruction for Shirley Mathes, for example, reads as follows:

> If you find in favor of Plaintiff and against one or more defendants, then you must award Plaintiff such sum as you believe will fairly and justly compensate Plaintiff for any damages you believe Plaintiff and decedent sustained and Plaintiff is reasonably certain to sustain in the future as a direct result of the fatal injury to Shirley Mathes. . . . You must not consider grief or bereavement suffered by reason of the death.

 Ford complains that this instruction allowed the jury to award damages for pain and suffering, and, therefore, assumes the decedents survived the collision impact and died consequent to the fire, an issue of fact that should have been expressly put to the jury. But whether the decedents survived the collision impact *was* put to the jury in the negligence and strict product liability verdict directors, which required the jury to determine whether Ford's acts—solely or in combination with Sher Express's acts—caused the deaths. The issued instruction conforms with MAI 5.01 [1996 Revision] and its explanation of when the phrase "and decedent" should be included to allow damages for pain and suffering, namely when "the evidence supports the submission of dam-

ages to decedent between the time of injury and time of death." MAI 5.01 Notes on Use [1996 Revision]. That the time period may have been very short does not eliminate the recoverability of such damages to the decedent. Jury instructions should present ultimate facts for determination, not detailed evidentiary facts. *See* Rule 70.02(b); *Lindquist*, 168 S.W.3d at 653.

Furthermore, the jury was separately instructed pursuant to MAI 2.02 (1980) that "[t]he court does not mean to assume as true any fact referred to in these instructions but leaves it to you to determine what the facts are." "This instruction reduces the chances of a jury improperly concluding that a controverted fact has been assumed by the court to be true." MAI 2.02 Committee Comment [1980 Revision]. Ford's argument ignores the role of MAI 2.02. The challenged instruction was proper. Point denied.

### III.

Ford's third point on appeal alleges that the trial court erred in admitting various evidence: the opinion of Jerry Wallingford, one of Mathes' experts; the existence of various alternative fuel system designs; and Ford's own "Crash Test 12114," offered by Mathes to illustrate how the defectively designed fuel system would result in leaked gasoline.

 Regarding Mr. Wallingford, Ford complains that he should not have been allowed to testify as an expert because he was not qualified and his opinion lacked scientific basis. An expert must be qualified "by knowledge, skill, experience, training, or education." Section 490.065.1.[1] An expert's opinion may be given "in the form of an opinion or inference" and may "embrace[ ] an ultimate issue to be decided

---

1. All statutory references are to Mo.Rev.Stat. (2000) unless otherwise noted.

by the trier of fact." Section 490.065.2. "The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to" the expert, and "must be of a type reasonably relied upon by experts in the field." Section 490.065.3. "Any weakness in the factual underpinnings of the expert's opinion or in the expert's knowledge goes to the weight that testimony should be given and not its admissibility. In general, the expert's opinion will be admissible, unless the expert's information is so slight as to render the opinion fundamentally unsupported." *Jones v. Grant*, 75 S.W.3d 858, 863 (Mo. App.2002) (quoting *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 246 (Mo. banc 2001)). "The determination of whether an individual qualifies as an expert witness, and whether his or her testimony is to be admitted, is a matter left to the sound discretion of the trial court...." *Cole v. Goodyear Tire & Rubber Co.*, 967 S.W.2d 176, 185 (Mo.App.1998).

■ The record clearly refutes Ford's contentions. We recount only a few of the relevant facts in the record: Mr. Wallingford was properly qualified as an expert, based on education, training, and experience in the subjects on which he testified, namely forensic engineering, safety engineering, automotive engineering, vehicle fires, crash testing, and accident reconstruction. He also formerly worked for Ford Motor Company as a designer and tester of light trucks. In developing his opinion, he examined the Mathes F–150 and the camper-trailer it was pulling. He examined the accident report, the accident site, photographs of the accident scene, and depositions of accident witnesses. He examined an undamaged F–150 of the type in this accident, to evaluate its design. He reviewed Ford's own documents, drawings, crash tests, and specifications. Based on

his review of the evidence, Mr. Wallingford opined that the anti-lock-brake sensor guard gouged the fuel tank of the Mathes F–150, causing fuel to spill. To show that alternative, safer designs were feasible, he demonstrated how the fuel tank could be shielded for better protection from punctures, using a stock Ford fuel-tank shield used on other Ford pickups. He explained that other auto makers use rounded anti-lock-brake sensor guards, rather than pointed guards, and that even Ford now uses rounded guards on its F–150 pickups. We cannot say the facts Mr. Wallingford relied on were so slight as to render the opinion fundamentally unsupported. Any weaknesses in Mr. Wallingford's qualifications or analysis were proper subjects for Ford to argue to the jury, but are not grounds for excluding his testimony.

■ Ford complains that Mr. Wallingford did not personally conduct all of the tests on which he relied in forming his opinion. But section 490.065 does not require experts to personally conduct tests in order to qualify as experts in the case. *State ex rel. K.R. v. Brashear*, 841 S.W.2d 754, 758 (Mo.App.1992). The expert need only rely on facts "of a type reasonably relied upon by experts in the field." Section 490.065.3. That Mr. Wallingford did.

Ford also complains that Mr. Wallingford's opinion regarding the contortions the F–150's axle suffered in the collision was not disclosed prior to trial. The record flatly refutes this contention. Ford also claims there was *no* evidence, other than Mr. Wallingford's allegedly improper opinion, that the rear axle rotated to push the anti-lock-brake guards toward the fuel tank. We think the large gouge in the fuel tank contradicts Ford's assertion.

Finally, Ford challenges the admission of Ford's own Crash Test 12114. Ford contends that 12114 was offered to show Ford had notice of the defect; for that

purpose, 12114 is irrelevant because it was not performed until years after the Mathes vehicle was sold. Again, the record clearly contradicts Ford's assertion: Mathes offered 12114 to show that the anti-lock-brake guards could puncture the fuel tank, not to show Ford had notice of the defect. The point is denied.

### IV.

Ford argues in its fourth point that the trial court erred in allowing Linda Mathes, Jacob's mother, to read to the jury a poem that Linda said articulated her loss of Jacob's companionship and comfort better than her own words could. Ford additionally argues that the introduction of a photo showing the interior of the F–150 cab, including the burned bodies of the decedents, was prejudicial and had little probative value.

Ford argues that the poem was irrelevant, cumulative, and prejudicial. Ford also argues that it served as direct evidence of Linda's grief and bereavement, for which damages are disallowed in wrongful death actions. Section 537.090. Of these arguments, only the objections that the poem was prejudicial and cumulative were raised to the trial judge. "[A]llegations of error not presented to or expressly decided by the trial court shall not be considered in any civil appeal from a jury tried case." Rule 84.13. We, therefore, address only whether the poem was cumulative or prejudicial.

■■■ Evidence of a plaintiff's loss of companionship and comfort from a decedent is probative of statutorily allowed damages. Section 537.090. The trial court has discretion in balancing the probative and prejudicial values of evidence. *State v. Stallings,* 957 S.W.2d 383, 390 (Mo.App.1997). Likewise, the trial court has discretion to decide the cumulative value of evidence, and to decide when cu-mulative presentation of evidence should cease. *State v. Rhoden,* 654 S.W.2d 352, 355 (Mo.App.1983). Ford cites no case, and we find none, in which an appellate court has found admission of a poem constitutes an abuse of discretion. We cannot say the trial court abused its discretion in assessing the cumulative or prejudicial effect of allowing Linda to read the poem.

■■ Ford argues that a photograph showing the interior of the F–150 cab at the scene, including the burned bodies of the decedents, was prejudicial and irrelevant. On the contrary, the record shows that the photograph was relevant to Dr. Burton's testimony regarding the impact injuries because the photo corroborated that the cab was not crushed so severely as to have killed the decedents. Additionally, the photograph corroborated Dr. Burton's testimony about the positions of the bodies, to the extent that the photo showed that the bodies were seated upright, not in a slumped position. The challenged photo was the sole visual evidence of the condition of the decedents; it was not one in a series of gruesome images. We cannot say the trial court abused its discretion in assessing the cumulative or prejudicial effect of the photograph. Point denied.

The judgment is affirmed.

PAUL M. SPINDEN, Presiding Judge, and VICTOR C. HOWARD, Judge, concur.