Michael **RINEHART**, Respondent,

v.

**SHELTER GENERAL INSURANCE COMPANY**, Appellant.

No. WD 66779.

Missouri Court of Appeals, Western District.

June 17, 2008.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 29, 2008.

Application for Transfer Denied Sept. 30, 2008.

Susan F. Robertson, Columbia, MO, for appellant.

Louis C. Accurso, Kansas City, MO, Edward D. Robertwon, Jr., Mary D. Winter, Anthony L. Dewitt, Jefferson City, MO, for respondent.

Div. IV: HOWARD, C.J., HARDWICK and WELSH, JJ.

LISA WHITE HARDWICK, Judge.

Following a jury verdict, Michael Rinehart ("Rinehart") was awarded actual and punitive damages on a claim against Shelter General Insurance Company ("Shelter") for bad faith refusal to settle insurance claims arising from an automobile accident. Shelter raises seven points on appeal, alleging evidentiary error, instructional error, and insufficient evidence to support the judgment. For reasons explained herein, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

Viewed in a light most favorable to the judgment, the evidence at trial was as follows.

On August 16, 1998, Rinehart was driving while intoxicated when he caused a collision that resulted in serious injury to the driver and a passenger of a second vehicle, Renee Ingram ("Ingram") and Kelly Krohn ("Krohn"). Rinehart's passenger and long-time friend, Charles Adkins ("Adkins"), was also seriously injured in the accident.

The vehicle Rinehart was driving at the time of the accident was insured by Shelter with liability limits of $50,000 per person and $100,000 per occurrence. Rinehart was an insured driver on the policy. Shelter assigned a claims adjuster, Charles Nitz, to handle the Rinehart file on August 31, 1998.

Terry Evans, an attorney for Ingram and Krohn, sent written settlement demands to Shelter in January and February of 1999. The letters demanded $50,000 for each claimant. Nitz responded with a letter stating that Shelter was willing to pay the policy limit of $100,000, but Ingram and Krohn would have to agree with Adkins on how to divide the total amount. Evans replied in writing that Shelter's proposal was unacceptable because Adkins was "acting in concert" with Rinehart at the time of accident and, therefore, should not be considered an "equal player in the division of the $100,000." Nitz responded that Shelter's proposal remained the same.

Nitz had communicated with Adkins on three occasions in 1998. Adkins, who had been friends with Rinehart for twenty years, did not retain counsel and did not make an official demand on Shelter. In late May or early June 1999, Nitz told Adkins there was "nothing more he could do for [him]." Based on that conversation, Adkins understood that he would not receive any payment from Shelter. Adkins never made a claim against Rinehart for the accident.

On June 17, 1999, Evans again sent written demands to Shelter for payment of the $50,000 per person policy limit to Ingram and Krohn. The demand letters stated that the offer would expire on August 16, 1999, and all offers to settle would then be forever withdrawn. The letters further stated that Ingram and Krohn would interpret a rejection of their offer as a bad faith refusal by Shelter to settle the insurance claims.

Shelter did not inform Rinehart about the June 17 demand letters. However, on July 6, 1999, Shelter sent Rinehart a letter stating that it intended to settle with Ingram and Krohn for two-thirds of the policy limits unless Rinehart objected within twenty days. Rinehart did not object.

On August 3, 1999, Shelter sent a letter to Evans offering to settle with Ingram and Krohn for two-thirds of the policy limits if the claimants were willing to waive any underinsured motorist claims and hospital liens. Evans did not accept the offer, and no settlement was reached by the August 16, 1999 deadline.

Ingram and Krohn thereafter filed a personal injury lawsuit against Rinehart. Upon judgment entry, Ingram was awarded $2,961,192.55 in damages, plus prejudgment interest of $630,735.60; Krohn was awarded $876,468.57 in damages, plus prejudgment interest of $186,690.24. To avoid a garnishment of the judgment, Rinehart entered into a written agreement with Ingram and Krohn, whereby he consented to pursue a lawsuit against Shelter for bad faith refusal to settle the insurance claims. Rinehart further agreed that any proceeds from the lawsuit, as well as any of his annual earned income in excess of $50,000, would be used to satisfy the personal injury judgment against him.

On September 24, 2003, Rinehart filed suit alleging that he incurred financial loss, damage to his credit, attorneys' fees, and emotional distress as a result of Shelter's bad faith refusal to settle the insurance claims with Ingram and Krohn. Following a jury verdict in Rinehart's favor, the court entered judgment awarding him $6,285,001.83 in compensatory damages and $3,000,000 in punitive damages. Shelter appeals.

### ADMISSION OF EVIDENCE

■ Shelter brings three points contending the circuit court erred in overruling objections to certain evidence introduced at trial by Rinehart. Since the trial court is vested with broad discretion in determining the admissibility of evidence, we will not disturb its rulings absent a clear abuse of discretion. *State v. Davis*, 226 S.W.3d 167, 169 (Mo.App.2007). Such abuse occurs when the trial court's ruling is clearly against the logic of the circumstances and so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration. *Id.* Even if evidence was improperly admitted, we will not reverse unless the error was prejudicial and materially affected the merits of the action. *Romeo v. Jones*, 144 S.W.3d 324, 332 (Mo.App.2004). Accordingly, Shelter has the burden of showing both abuse of discretion and prejudice. *Id.*

■ In Point I, Shelter argues the circuit court abused its discretion in allowing Rinehart to testify about his agreement with Ingram and Krohn to pursue the bad faith claim against Shelter. Rinehart testified that the agreement was the only option he had to pay the personal injury judgment and provide for his own family. The court overruled Shelter's objections to this testimony. Shelter asserts Rinehart's testimony was unfairly prejudicial in that it injected issues of poverty and invoked sympathy for Rinehart, Ingram, and Krohn, and it encouraged the jury to return a verdict to benefit Ingram and

Krohn, who were not parties to the lawsuit.

■ As an initial matter, we discern no prejudice from the challenged testimony because the jury received other evidence of Rinehart's agreement to pursue the bad faith claims. A complaining party is not entitled to assert prejudice if the challenged evidence is cumulative to other related admitted evidence. *Biller by Summers v. Big John Tree Transplanter Mfg. & Truck Sales, Inc.*, 795 S.W.2d 630, 635 (Mo.App.1990).

During Rinehart's testimony, the circuit court admitted into evidence his actual written agreement with Ingram and Krohn. The court overruled Shelter's objections to the written agreement, and Shelter has not challenged the admissibility of the document on appeal. Thus, we must assume the jury properly heard evidence concerning the terms of the agreement, which provided Rinehart with a means of satisfying the personal injury judgment and protecting some of his personal assets. The agreement specifically required Rinehart to pay the proceeds of the bad faith lawsuit to Ingram and Krohn. It also stated that Rinehart would pay Ingram and Krohn all of his earned income in excess of $50,000 annually. Even without Rinehart's testimony, the mere existence of the agreement allowed the jury to infer that Rinehart did not have sufficient personal assets to pay the multi-million dollar personal injury judgment and that Ingram and Krohn would eventually benefit from the bad faith lawsuit. Accordingly, Rinehart's testimony was largely cumulative of information directly implicated by the agreement.

■ It further appears that Shelter opened the door to Rinehart's testimony about the agreement by questioning Attorney Terry Evans as to whether a garnishment action was completed after Ingram and Krohn obtained the personal injury

judgment. Through this line of questioning, Shelter attempted to show that Ingram and Krohn had not made serious attempts to collect the judgment from Rinehart. In light of Shelter's inference that the claimants did not expect Rinehart to pay the judgment with his personal assets, Rinehart was entitled to explain the reasons he entered the agreement and his payment obligations thereunder.

■ Shelter argues that Rinehart's testimony runs afoul of the general prohibition on injecting a litigant's financial condition to influence the jury. *Firestone v. Crown Ctr. Redevelopment Corp.*, 693 S.W.2d 99, 105 (Mo. banc 1985). We note, however, that evidence relating to the financial status of the party may be relevant to the issues at trial, in which case it may be properly presented. *Id.*

Rinehart's explanatory comments regarding the agreement were relevant to prove his emotional distress as a part of the damages on his bad faith claim. His petition alleged that he "suffered mental agony, distress, anxiety, and worry as a result of being faced with a substantial judgment against him." Rinehart's testimony—about the financial pressure he felt from the judgment, the need to pay Ingram and Krohn, and the need to provide for his family—was necessary to explain the factors causing him emotional distress as a direct result of Shelter's failure to pay the claims of the accident victims. Accordingly, the testimony was admissible in the context of his bad faith claim, and we find no abuse of the circuit court's discretion. Point I is denied.

■ In Point II, Shelter asserts the circuit court erred in admitting evidence regarding Anthony Fields, another Shelter insured who was involved in a car accident unrelated to Rinehart's accident. Rinehart sought to produce evidence that Shelter's handling of the Fields' file was

similar to problems that arose in the management of his file. The court overruled Shelter's objections that the evidence was unfairly prejudicial and lacked any factual foundation or legal relevance to prove a pattern or practice of misconduct. We find no abuse of discretion because the record supports the court's finding that the evidence was admissible.

■■■■ To prove his bad faith claim, Rinehart was required to show Shelter's mental state in refusing to settle the accident claims of Ingram and Krohn. *Zumwalt v. Utils. Ins. Co.*, 360 Mo. 362, 228 S.W.2d 750, 754 (1950). The evidence must demonstrate that the insurer had "intentional disregard of the financial interests of the plaintiff in the hope of escaping the full responsibility imposed upon it by its policy." *Id.* Circumstantial evidence is sufficient to satisfy this state of mind requirement. *Truck Ins. Exch. v. Prairie Framing, LLC*, 162 S.W.3d 64, 94–95 (Mo. App.2005).

■■■■ Additionally, Rinehart pled, and submitted to the jury, a claim for punitive damages. "Punitive damages require clear and convincing proof of a culpable mental state ... 'by ...' reckless disregard for an act's consequences (from which evil motive is inferred)." *Downey v. McKee*, 218 S.W.3d 492, 497 (Mo.App.2007)(quoting *Werremeyer v. K.C. Auto Salvage Co.*, 134 S.W.3d 633, 635 (Mo. banc 2004)). When such intent is a focus of the inquiry, "evidence should be allowed to take a wide range," and a party's actions toward others which tend to demonstrate intent in the present case is relevant. *Brockman v. Regency Fin. Corp.*, 124 S.W.3d 43, 51 (Mo.App.2004)(quoting *Rice v. Lammers*, 65 S.W.2d 151, 154 (Mo.App.1933)). Evidence of conduct not directly related to the claim becomes admissible if the acts are sufficiently connected to show the defendant's disposition, intention, or motive in the acts central to the current claim of damage. *Id.*

Here, the evidence at trial showed that both the Fields case and this case: (1) involved collisions that occurred in the same year; (2) involved insureds who caused the collision while intoxicated; (3) had similar policy limits; (4) involved three claimants other than the insured; (5) were handled by the same claims supervisor; (6) were handled by the same branch manager; and, (7) were handled by the same legal defense firm. Both *Fields* and this case resulted in judgments against the insureds well in excess of the policy limits and without an offer to settle for policy limits. Additionally, both in *Fields* and here, the plaintiffs presented evidence of poor communication between Shelter and its insured.

The circuit court determined that these factors showed a sufficient nexus between *Fields* and the instant case to meet the requirements for admissibility. Here, where the *Fields* evidence goes to state of mind, a necessary element of Rinehart's bad faith claim and his claim for punitive damages, and the evidence showed multiple similarities in the circumstances and actions surrounding the two claims, we cannot say that the trial court abused its discretion in admitting the Fields evidence for those purposes. Point II is denied.

■■■ Point III asserts the trial court erred in allowing Rinehart's expert, Allan Windt, to testify that Shelter demonstrated bad faith in handling the Rinehart case file. Shelter argues the testimony was irrelevant and lacked foundation because: (1) Windt did not testify that his opinion was based on the type of information reasonably relied upon by others in his field or was otherwise reasonably reliable, as required by Section 490.065; and (2) Windt admitted he did not know the legal standard for bad faith.

Windt testified as an insurance industry expert based on his thirty years of experience in handling claims for more than seventy insurance companies and a wide variety of corporations as insureds. He is the author of a legal treatise, "Insurance Claims and Disputes," that was originally published by McGraw–Hill/West Publishing in 1982 and is now in its fourth edition. At trial, Windt testified about his review of the Rinehart claims file and the depositions, documents, and exhibits related to this case. Windt created a timeline and broke down the history of the claims file into five stages, giving his opinion of Shelter's claims handling procedures during each stage, as summarized herein.

"Stage 1" was from the time of the accident in August 1998 through December 1998. Windt testified that while it would have been appropriate for Shelter to file an interpleader action and deposit the $100,000 policy limit amount into the court, Shelter's failure to do so at that time did not constitute bad faith.

"Stage 2" occurred during January and February of 1999 when Shelter received two separate letters on behalf of the Ingrams and Krohns, offering to settle on their behalf for $50,000 each. Windt testified that Shelter was negligent in failing to advise Rinehart of these offers.

"Stage 3" began in May 1999. Windt testified that a May 4 letter which Shelter understood to be an offer to settle with the Krohns and Ingrams for two-thirds of the policy limits should have been immediately accepted by Shelter. Windt did not concede that the letter actually created an offer, but stated that if Shelter believed that the offer existed, it should have acted to immediately accept it.

"Stage 4" began in July 1999 based on Shelter's understanding that Krohn and Ingram had reiterated their offer to settle for two-thirds of the policy limits. Windt testified that Shelter should have acted immediately on this perceived offer. He further testified that Shelter's actions, which included notifying Rinehart by letter and giving him twenty days to respond, was unreasonable under the circumstances.

"Stage 5" occurred during the two weeks preceding the August 16 settlement deadline imposed by Ingram and Krohn. Windt testified that Shelter's August 3 letter—offering to pay the claimants two-thirds of the policy limit—was indicative that Shelter either knew it did not have a settlement offer for the two-thirds limits or was unsure of the offer. Windt characterized Shelter's conduct during this stage as reckless. Based on his review of the materials from the claims file and case discovery, Windt concluded the evidence was sufficient to indicate that Shelter intentionally disregarded Rinehart's financial interest in an attempt to escape full responsibility on his policy.

■ Section 490.065, which governs the admissibility of expert testimony in a civil action, provides that an expert opinion must be based on information considered reasonably reliable in the subject field. Shelter filed multiple motions and raised several objections to Windt's testimony at trial but did not challenge the foundation of the expert's testimony pursuant to this specific requirement in Section 490.065. "Claims of inadequate foundation will not be considered for the first time on appeal." *State v. Blue*, 875 S.W.2d 632, 633 (Mo. App.1994). The grounds advanced on appeal are limited to those stated at trial. *State v. Phillips*, 939 S.W.2d 502, 505 (Mo. App.1997). Because Shelter did not give the trial court the opportunity to consider and correct any deficiencies in Windt's testimony based on the facts he reasonably relied upon, the foundation argument is waived and cannot be considered on appeal. *Blue*, 875 S.W.2d at 633.

■ Shelter also argues that Windt's testimony lacked foundation because he was unfamiliar with the legal definition of bad faith in Missouri. Regardless of whether Windt understood the legal standard to be applied by the court, he testified to facts and circumstances that satisfied the key element of Rinehart's claim. Based on the nature of Shelter's conduct, Windt confirmed there was circumstantial evidence to support a finding that the insurer intentionally disregarded Rinehart's financial interest in the hope of escaping full responsibility on his policy. "Testimony by an expert is almost always useful as to what facts are critical in the assessment of whether or not the insurer acted in bad faith." 17A Couch on Insurance 3d § 252:25 (2005). Windt's testimony was admissible because it addressed the factual circumstances necessary to support the mental element of Rinehart's bad faith claim. *See Zumwalt,* 228 S.W.2d at 754. Point III is denied, as we find no abuse of the trial court's discretion.

## JURY INSTRUCTIONS

■ In Point IV, Shelter contends the circuit court erred in submitting a verdict director based on Missouri Approved Instruction (MAI) 19.01,[1] which allowed the jury to determine whether the insurer "directly caused or directly contributed to cause damage to [Rinehart]." Because

MAI 19.01 is only appropriate in cases involving multiple tortfeasors or multiple causes of damage, Shelter argues the instruction improperly lowered Rinehart's burden of proof for causation on the bad faith claim. Shelter also asserts the verdict director was "confusing, roving, and misdirected the jury" by failing to include the ultimate facts necessary to determine whether the insurer acted with bad faith in refusing to settle the Krohn and Ingram claims.

■ Our review of the trial court's submission of a jury instruction is *de novo.* *Marion v. Marcus,* 199 S.W.3d 887, 893–94 (Mo.App.2006); Mo.R.Civ.P. 70.02. "We will reverse only if the offending instruction misdirected, misled, or confused the jury, resulting in prejudicial error." *Kopp v. Home Furnishing Ctr., LLC.,* 210 S.W.3d 319, 328 (Mo.App.2006). "We view the evidence most favorably to the instruction and disregard contrary evidence." *Id.*

■ MAI 19.01 is applicable "in cases in which there are multiple causes of damage but which may not involve another party or tortfeasor." MAI 19.01 Comm. Cmt. (1995 New); *See also Mathes v. Sher Express, L.L.C.,* 200 S.W.3d 97, 108–09 (Mo.App.2006). The purpose of the director is to avoid misleading the jury through the "direct result" language of the standard jury director when there are multiple causes or tortfeasors.[2] *Mathes,*

---

1. MAI 19.01 provides as follows:

   **Verdict Directing Modification—Multiple Causes of Damage**
   In a case involving two or more causes of damage, the "direct result" language of paragraph Third of verdict directing instructions such as 17.01 or 17.02 might be misleading. In such cases, plaintiff, at his option, may substitute one of the following:
   Third, such negligence directly caused or directly contributed to cause damage to plaintiff. Third, such negligence either directly caused damage to plaintiff or combined with the [acts of (*here describe another causing damage*)] [condition of

   the (*here describe product*)] to directly cause damage to plaintiff.

2. The Committee Comment (1995 New) to MAI 19.01 indicates the verdict director embodies the principle set forth in *Gaines v. Property Servicing Co.,* 276 S.W.2d 169, 173–74 (Mo.1955):

   The general rule is 'that if a defendant is negligent and his negligence combines with that of another, or with any other independent, intervening cause, he is liable, although his negligence was not the sole negligence or the sole proximate cause, and although his negligence, without such other

200 S.W.3d at 109. Further, when multiple potential causes of damage are present, failure to use the causation language in MAI 19.01 may constitute reversible error. *Snelling v. Gress,* 996 S.W.2d 538, 540–41 (Mo.App.1999). If there is an MAI "applicable in a particular case that the appropriate party requests or the court decides to submit, such instruction shall be given to the exclusion of any other instructions on the same subject." Rule 70.02(b).

Rinehart filed suit against Shelter on the theory of bad faith refusal to settle insurance claims, but he acknowledged that the underlying cause of the insurance claims was his involvement in a car accident. Shelter also raised the issue at trial by presenting evidence of Rinehart's conduct in causing the collision. As recognized in *Mathes,* 200 S.W.3d at 108–09, for purposes of using MAI 19.01, multiple causes can include successive events, such as a pre-existing medical condition, that may not involve another tortfeasor or party to the case. Rinehart requested MAI 19.01 in this case, and the court properly submitted it based on evidence of multiple causative factors for Rinehart's losses, including the existence of the insurance claims and Shelter's refusal to settle.

■■■■ Shelter also asserts the verdict director was confusing and gave the jury a "roving commission" because it failed to provide important factual details of the wrongful conduct. "To avoid a roving commission, the court must instruct the jurors regarding the specific conduct that renders the defendant liable." *Nagaragadde v. Pandurangi,* 216 S.W.3d 241, 247 (Mo.App.2007). The verdict director submitted by the court stated:

Your verdict must be for plaintiff if you believe:

> independent, intervening cause, would not have produced the injury.'

First, Shelter General Insurance Company assumed control over negotiation and settlement of claims brought against Michael Rinehart by Renee and Greg Ingram and Kelly and Matthew Krohn; and

Second, Renee and Greg Ingram and Kelly and Matthew Krohn made an offer to settle their claims against Michael Rinehart within the limits of the Shelter insurance policy issued to Michael Rinehart; and

Third, Shelter General Insurance Company refused to settle the claims of Renee and Greg Ingram and Kelly and Matthew Krohn within the policy limits by the August 16, 1999 deadline; and

Fourth, in so refusing, Shelter General Insurance Company acted in bad faith; and

Fifth, such refusal directly caused or directly contributed to cause damage to plaintiff.

Shelter argues the second and third paragraphs did not clearly instruct the jury as to which settlement demands were at issue. The evidence at trial showed that the attorney for Krohn and Ingram sent a policy limits settlement demand to Shelter on June 17, 1999, which stated that the demand expired on August 16, 1999. Shelter points out there was also testimony from Rinehart's expert, Allen Windt, that Krohn and Ingram offered to settle for two-thirds of the policy limits on May 4, 1999, and July 14, 1999. Although there was no evidence to suggest that the August 16 deadline applied to the May or July settlement offers, Shelter argues the verdict director was confusing because it referred only to the August 16 deadline and did not clearly instruct the jury as to

(Internal citations omitted.)

which offers to settle could constitute bad faith if refused by Shelter.

■ Contrary to Shelter's argument, the verdict director was not confusing as to the ultimate facts necessary for the jury's decision. Rinehart's basic theory of liability was that Shelter demonstrated bad faith in refusing to settle the insurance claims by the August 16, 1999 deadline. The evidence offered at trial clearly supported the existence of the deadline. There was no evidence presented that the May 4 or July 14 demands, which were disputed at trial, created a new deadline or extended the deadline beyond August 16. When the plaintiff's theory is supported by the evidence and the instruction submits the ultimate facts that define the plaintiff's theory for the jury, the instruction is not a roving commission. *Mathes,* 200 S.W.3d at 109. Here, the verdict director properly submitted Rinehart's theory of liability by asking the jury to determine if Shelter refused to settle the case by the August 16 deadline and whether such refusal constituted bad faith. Point IV is denied.

### SUFFICIENCY OF EVIDENCE

■ In Points V through VII, Shelter contends the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict (JNOV) because Rinehart did not present sufficient evidence to support his claims for bad faith liability and punitive damages. We review the denial of these motions *de novo* to determine whether the plaintiff made a submissible case. *BMK Corp. v. Clayton Corp.,* 226 S.W.3d 179, 187 (Mo.App.2007); *Townsend v. E. Chem. Waste Sys.,* 234 S.W.3d 452, 462 (Mo.App.2007).

To make a submissible case, a plaintiff must present substantial evidence regarding every fact essential to liability. Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of facts

can reasonably decide a case. In determining whether a plaintiff has made a submissible case, we presume that the plaintiff's evidence is true and disregard any of the defendant's evidence which does not support plaintiff's case. We view the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff. It is only where there is a complete absence of probative fact to support the jury's conclusion that this Court will decide the plaintiff did not make a submissible case.

*BMK,* 226 S.W.3d at 188 (internal citations and quotations omitted).

■ A bad faith claim requires proof of the following elements: "(1) the liability insurer has assumed control over negotiation, settlement, and legal proceedings brought against the insured; (2) the insured has demanded that the insurer settle the claim brought against the insured; (3) the insurer refuses to settle the claim within the liability limits of the policy; and (4) in so refusing, the insurer acts in bad faith, rather than negligently." *Dyer v. Gen. Am. Life Ins. Co.,* 541 S.W.2d 702, 704 (Mo.App.1976). The existence of bad faith is a question of fact to be determined on a case-by-case basis. *Zumwalt.,* 228 S.W.2d at 754. In situations where an insurer fails to inform the insured of settlement offers and the status of negotiations, the second requirement that the insured demand that the insurer settle the claim is not necessary to show bad faith. *Ganaway v. Shelter Mut. Ins. Co.,* 795 S.W.2d 554, 564 (Mo.App.1990).

■ Ultimately, bad faith is a state of mind provable by direct or circumstantial evidence. *Id.* at 561. The evidence must establish that insurer intentionally disregarded the insured's best interests in an effort to escape its full responsibility under the policy. *Zumwalt,* 228 S.W.2d at 754.

In Point V, Shelter asserts there is no evidence to show that it disregarded Rinehart's financial interests in an attempt to avoid paying the policy limits. Rather, the evidence demonstrated that Shelter's objective was to settle with *all* potential claimants, including Adkins, for the $100,000 policy limit in order to protect Rinehart from potential personal liability from any claimant not included in the settlement. Thus, Shelter contends Rinehart failed to make a submissible case on the third element of the bad faith claim.

In response, Rinehart points to evidence indicating that Shelter did not consider Adkins to be a legitimate potential claimant at the time settlement negotiations were conducted with Ingram and Krohn in 1999. Shelter communicated with Adkins three times during 1998, shortly after the accident. Adkins did not retain counsel or seek to pursue a claim with Shelter or against his friend Rinehart at any time. Shelter negotiated with Ingram and Krohn from January through August 1999, but there is no indication of negotiations with Adkins during that period. Adkins testified that in late May or early June of 1999, the claims adjuster for Shelter said "there was nothing more he could do for [him]." This evidence supports Rinehart's contention that Shelter had no intention of settling with Adkins during 1999 and merely used him as a 'straw man' for purposes of negotiating a settlement with Ingram and Krohn for two-thirds of the policy limit.

Shelter asserts Adkin's testimony was so self-contradictory and conflicting that it alone cannot be relied upon to prove a fact necessary to make a submissible case under Missouri law. *See Marrone v. Modine Heat & Transfer*, 918 S.W.2d 315, 320 (Mo.App.1996). We disagree. While Adkins was unable to recall specific dates, he consistently testified about the general timing and content of the conversation he had with the claims adjuster in late May or

early June 1999. The testimony is important because: (1) the conversation occurred during the same period Shelter was negotiating with Ingram and Krohn; and (2) Shelter told Adkins that nothing could be done for him at approximately the same time it was telling Ingram and Krohn that one-third of the policy limit was being reserved for Adkins. The lack of precise dates did not render Adkins' testimony unreliable on these critical facts.

Rinehart presented sufficient evidence to support his bad faith claim. The demand letters from Ingram and Krohn set a settlement deadline of August 16, 1999, and warned Shelter that a failure to settle would be considered bad faith. The only reason Shelter gave for its refusal to settle was the potential claim of Adkins, but Rinehart has presented evidence to show that Shelter did not intend to settle with Adkins. The evidence supports an inference that Shelter tried to escape its full responsibility by paying only two-thirds of the policy limit and thereby intentionally disregarded Rinehart's obligations to Ingram and Krohn. Point V is denied.

In Points VI and VII, Shelter challenges the submissibility of the punitive damages claim. Shelter argues: (1) the evidence was insufficient to show evil motive or reckless indifference; and (2) Rinehart improperly presented evidence and argument urging the jury to punish Shelter for its conduct in the unrelated Fields' case.

Whether the evidence adduced at trial was sufficient to submit a claim for punitive damages is determined as a matter of law. *Peters v. Gen. Motors Corp.*, 200 S.W.3d 1, 24 (Mo.App.2006). The evidence and its reasonable inferences are considered in the light most favorable to the plaintiff and unfavorable evidence and inferences are disregarded. *Id.* A submissible case for punitive damages is made if the plaintiff presents clear and convincing

evidence that the defendant's conduct was outrageous because of evil motive or reckless indifference. *Harrell v. Cochran,* 233 S.W.3d 254, 260 (Mo.App.2007). Evidence is clear and convincing when it establishes the character of the defendant's conduct to a high probability. *Id.*

We find the evidence Rinehart presented on the bad faith claim is also sufficient to support the request for punitive damages. In light of Adkins' testimony that Shelter said there was nothing more it could do for him in late May or early June 1999, the jury could infer that Shelter thereafter demonstrated reckless indifference for Rinehart's obligations by refusing to settle the claims of Ingram and Krohn for the full policy limits. Shelter also failed to keep Rinehart fully informed about the settlement negotiations. Alan Windt, Rinehart's expert, specifically characterized Shelter's mental state as "reckless" during multiple steps in the claims process. The jury was also entitled to consider that Shelter used similar duplicitous tactics in the Fields case to avoid paying policy limits. " 'Evidence of past action by an individual or group of individuals is relevant as bearing upon the intent with which they later perform a similar act.' " *Brockman v. Regency Fin. Corp.,* 124 S.W.3d 43, 51 (Mo.App.2004) (quoting *Russell v. Frank,* 348 Mo. 533, 154 S.W.2d 63, 66 (1941)). Point VI is denied, as there is clear and convincing evidence of Shelter's outrageous conduct due to its evil motive or reckless indifference for Rinehart's rights as an insured.

Shelter argues that its due process rights were violated when Rinehart used the Fields' evidence to urge the jury to punish Shelter for its conduct in the unrelated case. During the opening statement of the punitive damages portion of the trial, Rinehart's counsel stated:

You have in front of you the chart that I put up during the closing argument comparing the Fields and the Rinehart cases together. . . . So the question is: What is it going to take for them to get it, to stop rolling the dice with their insureds' future?

The bottom figure that you ought to consider, because they—when it comes to the insureds, when they roll the dice, those numbers that you have in front of you are a low of $6 million for what they put Mr. Rinehart through and $23 million for the Fields verdict.

If you want to get their attention and you want to get a change in the way these insurance companies treat their policyholders and treat claimants, you want them to be honest and not lie and not cheat, then you've got to hurt them. You've got to take away from them what is most precious to them, and that is their money, and it has to be a significant number.

The Due Process Clause "forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties." *Philip Morris USA v. Williams,* 549 U.S. 346, 127 S.Ct. 1057, 1063, 166 L.Ed.2d 940 (2007). A plaintiff may properly show harm to other victims because it is relevant to show the level of reprehensibility in the defendant's conduct. *Id.* at 1063–64. "Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public . . . [however,] a jury may not go further than this and use a punitive damages verdict to punish a defendant *directly* on account of harms it is alleged to have visited on nonparties." *Id.* at 1064 (emphasis added). In cases where relief is requested for improper jury argument in this regard, courts must provide "some form of protection." *Id.* at 1065.

In *Philip Morris,* the defendant had requested the trial court to instruct the

jury that punitive damages could not be awarded to punish the defendant for conduct affecting nonparties. *Id.* at 1064. The Supreme Court was clear to indicate that such protective measures must be made available to protect the defendant's rights "upon request." *Id.* at 1065.

Shelter did not request a limiting jury instruction for the Fields evidence in the instant case. Shelter did object to the admissibility of the Fields evidence in the liability phase of the case and had a standing objection throughout the punitive damages phase. Notwithstanding these objections, we have affirmed the trial court's ruling that the evidence was relevant and admissible for purposes of proving the mental elements of the bad faith and punitive damages claims. Rinehart's counsel properly used the Fields comparison during closing argument by stating: "When you look at intent and you're trying to figure out what is someone's state of mind, you're allowed to look at other similar cases. They had the Fields case ..."

To the extent there was any improper argument urging the jury to punish Shelter for its conduct in the Fields case, Shelter could have requested an instruction to limit the jury's consideration of the evidence in that regard. The court had no obligation to protect Shelter's due process rights in the absence of such a request. Moreover, Shelter did not raise this specific constitutional claim at trial and, therefore, failed to preserve it for appeal. Point VII is denied.

## CONCLUSION

We affirm the circuit court's judgment.

All Concur.