Shirley WADE, Personal Representative of the Estate of Clarissa E. Wade, Respondent,

v.

CLARION MORTGAGE CAPITAL, INC., Appellant.

No. WD 71128.

Missouri Court of Appeals, Western District.

May 11, 2010.

Steven M. Aaron and Joshua M. Ellwanger, Kansas City, MO, for appellant.

Paul K. Hentzen, Leawood, KS, for respondent.

Before Division One: KAREN KING MITCHELL, Presiding Judge, LISA WHITE HARDWICK, Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

Clarion Mortgage Capital, Inc. ("Clarion") appeals from the Jackson County trial court's judgment, following a jury verdict, which awarded Clarissa Wade ("Clarissa") $8,600 in damages on her fraudulent misrepresentation claim. Clarion contends that the trial court erred in its determination that Clarissa made a submissible case of fraud. Clarion maintains that Clarissa failed to present any evidence that its loan officer, Rob Hartman ("Hartman"), made representations directly to Clarissa concerning constraints on the disbursement of loan proceeds, or any evidence that such representations to Shirley Wade ("Shirley") were then communicated by Shirley to Clarissa. Clarion maintains that Clarissa thus failed to present any evidence that she relied on representations concerning constraints on the disbursement of loan proceeds before entering into the loan with Clarion. We affirm.

## Facts and Procedural History[1]

In 2004, Clarissa owned and lived in a home on Virginia Avenue in Kansas City, Missouri. Clarissa's daughter, Shirley, lived with her, and took care of Clarissa and her finances.

On July 28, 2004, Shirley answered an unsolicited telephone call at Clarissa's home. The individual on the phone asked Shirley if any work needed to be done on the home. Shirley told the caller that there was some work that needed to be done, but that her mother was 89 years old and did not have good credit. Notwithstanding, the caller sent someone out to meet with Shirley.

KC Builders sent Mike Phelps to Clarissa's home on July 29, 2004. Phelps identified himself and told Shirley he was known as "Big Mike." Big Mike walked around Clarissa's house with Shirley. Shirley showed him some bricks that had come loose and some rotted boards. Shirley also showed Big Mike some work that needed to be done on the inside of Clarissa's home.

After looking around the home, Big Mike quoted Shirley a price for the work. He wrote that price on the back of his business card. The price Shirley was given was $19,866. Shirley told Big Mike that Clarissa did not have that kind of money. Big Mike told Shirley that he would get Clarissa a loan.

Big Mike walked outside, and then came back into the house with a contract and a loan application. Clarissa signed the contract, which detailed the work to be done on the home.[2] The contract was filled out by Big Mike and showed Clarissa's last name as "Johnson," instead of Wade. "Johnson" had been Clarissa's first husband's name. Clarissa had remarried and was known as Clarissa Wade for fifty-nine years. However, the record title to her home was still in the name of Clarissa Johnson. Apparently, KC Builders, or

---

1. We view the facts in the light most favorable to the jury's verdict. *State v. O'Brien,* 857 S.W.2d 212, 215–16 (Mo. banc 1993).

2. None of the trial exhibits were submitted to this Court for review.

someone working with KC Builders, had conducted a title search on Clarissa's property before Big Mike went out to meet with Clarissa. Clarissa signed the contract as "Clarissa Johnson" because Big Mike told her to, since the house was titled in that name.

Big Mike also had Clarissa sign a Credit Application for a Property Improvement Loan. As with the contract addressing the construction work to be performed on the home, the loan application incorrectly noted Clarissa's last name as "Johnson." Clarissa again signed as "Clarissa Johnson" on Big Mike's instruction. The loan application paperwork had a variety of handwritten entries made by Big Mike, noting Clarissa's other credit obligations, including the existing first mortgage on her home, which had a balance of only $14,000.

The cost of the work to be performed as shown on the construction contract was $21,866, two thousand dollars more than Big Mike had quoted Shirley just moments before presenting the contract to Clarissa for her signature. Shirley did not notice this discrepancy until after her mother had signed the contract and until after Big Mike left.

When Big Mike left, he told Shirley he would be in touch. Big Mike told Shirley that "he got elderly people loans." However, Shirley did not believe her mother's loan application would be approved because Clarissa had bad credit, was elderly, and did not have much of an income.

On September 1, 2004, Big Mike called and told Shirley that Clarissa's loan had been approved.[3] Shirley was advised the loan would be through Clarion. Big Mike told Shirley that Hartman and Jeremy Bredwell ("Bredwell") would come to the house so Clarissa could sign necessary paper work.

About ten minutes later, Bredwell called and made arrangements to come to Clarissa's home. Bredwell and Hartman came to Clarissa's home on September 2, 2004. Both provided Shirley with their business cards, identifying themselves as loan officers for Clarion.

Hartman and Bredwell arrived at Clarissa's home with papers for Clarissa to sign. Clarissa was not feeling well that day and asked Hartman if Shirley could sign the paperwork for her. Hartman indicated that would be fine. Shirley thus signed Clarissa's name to both a Uniform Resident (sic) Loan Application and a Mortgage Brokerage Business Contract. Shirley told Hartman and Bredwell that she had seen Big Mike on television regarding work he had not finished. Shirley questioned them about it and was told that the contractor would not get paid until the work was done. This conversation occurred in the kitchen—the same room where the paperwork had been signed.

On September 21, 2004, Hartman and Bredwell returned to Clarissa's home. They arrived with a stack of papers to be signed. Though Clarissa was present, Shirley again signed Clarissa's name to all of the papers. Though the record is not completely clear, it appears the papers signed on September 21, 2004, were "final" loan documents, as they included a Settlement Statement. The Settlement Statement reflected a number of Clarissa's creditors who were to be paid from the loan proceeds, including the first mortgage lender. The Settlement Statement also reflected that Clarissa would receive "cash" from the transaction in the amount of $1666.32.

3. The total amount of the loan was for $48,000.

Shirley signed all of the papers in the kitchen, with Hartman and Bredwell standing on either side of her. Shirley testified her mother was "there at the time" and "directed" her to sign for her. Hartman and Bredwell then left with the signed papers and told Shirley they would bring Clarissa's copies back to her, along with her check for the net loan proceeds once the loan closed.

On September 22, 2004, the day after the final loan documents were signed, KC Builders began work on Clarissa's home. Clarissa's loan closed on September 24, 2004. The total amount of Clarissa's loan was $48,000. KC Builders was paid $25,000 from the loan proceeds on that same date.

On September 27, 2004, Hartman and Bredwell returned to Clarissa's home. Hartman gave Clarissa her $1,666.32 check for the balance of the loan proceeds. Hartman also gave Clarissa copies of the final loan documents which had been signed on September 21, 2004.

KC Builders did not finish its work on Clarissa's home until the third week of October 2004. Almost immediately, Shirley noticed certain defects in the work. Painted walls had not been primed, and the wood behind the paint was bleeding through. A wood floor installed in a utility room over a concrete floor covered what had been the exposed overflow drain. The garage floor started cracking. The garage door would not close all of the way where concrete had been poured. Shirley called KC Builders about these problems several times. Shirley did not know at the time, and did not learn until later, that KC Builders had been paid $25,000 on the day Clarissa's loan closed. Shirley could not explain why KC Builder's was paid more than the amount of the construction contract, $21,866. Given Hartman's and Bredwell's representations that the con-tractor would not be paid until the construction work was complete, Shirley could not explain why the contractor had been paid before the work was completed.

Shirley also testified that although the loan proceeds were to have been used in part to pay Clarissa's creditors, many of those creditors continued to call Clarissa for payment, suggesting that some of the creditors had not been paid from the loan proceeds.

On May 6, 2005, a Petition was filed on Clarissa's behalf, through her next friend, Shirley, against Clarion. The petition as-serted a claim for fraudulent misrepresen-tation by Clarion with respect to the re-lease of loan proceeds to the contractors before the work on Clarissa's house was complete. The petition also alleged a vio-lation of the Missouri Merchandising Prac-tices Act. The case was tried February 23–26, 2009. At the close of all of the evi-dence, Clarion's motion for directed ver-dict was overruled except that the trial court did not permit the submission of punitive damages. The jury returned a verdict for Clarissa on the fraudulent mis-representation claim in the amount of $8,600. The jury returned a verdict in favor of Clarion on the Missouri Merchan-dising Practices Act claim. The trial court entered its judgment accordingly on March 3, 2009. This appeal follows.

## Standard of Review

Whether Clarissa made a submissible claim of fraudulent misrepresentation, is a question of law which we review *de novo*. *Shobe v. Kelly*, 279 S.W.3d 203, 209 (Mo. App. W.D.2009) (citing *Rinehart v. Shelter Gen. Ins. Co.*, 261 S.W.3d 583, 595 (Mo. App. W.D.2008)). "We accept the plain-tiff's evidence as true, disregard the defen-dants' contradictory evidence, and draw all inferences in favor of the plaintiff's case." *Id.* We also review *de novo* whether the

evidence presented was substantial and whether the inferences drawn from the evidence were reasonable to support the jury's verdict. *Id.* A jury's verdict is reversed for insufficient evidence "only where there was a complete lack of probative fact to support its conclusion." *Id.*

## Analysis

■ In Clarion's sole point on appeal, it contends that the trial court erred in its determination that Clarissa made a submissible case of fraud. Clarion maintains that Clarissa failed to present *any* evidence that Hartman made any representations directly to Clarissa concerning the disbursement of the loan money or that Clarissa had knowledge of the alleged representations made by Clarion's loan officers to Shirley. Clarion maintains that Clarissa thus failed to present any evidence that she relied on the representations of Clarion's loan officers before signing the final loan documents on September 21, 2004.

■ In order to make a submissible case of fraudulent misrepresentation, Clarissa was required to present substantial evidence from which the jury could have reasonably found each and every element of her claim. *Townsend v. E. Chem. Waste Sys.*, 234 S.W.3d 452, 464 (Mo.App. W.D.2007).

The elements of fraudulent misrepresentation are:(1) the speaker makes a false, material representation; (2) the speaker knows the representation is false or is ignorant of its truth; (3) the speaker intends that the representation should be acted on by the hearer in the manner reasonably contemplated; (4) the hearer is ignorant of the falsity of the representation; (5) the hearer relies on the representation's truth; (6) the reliance is reasonable; and (7) the hear-er's reliance on the representation causes injury.
*Bryant v. Smith Interior Design Group, Inc.*, 310 S.W.3d 227, 233 (Mo. banc 2010). The two essential elements Clarion contends were supported by *no* evidence are (1) whether the speaker, one of Clarion's loan officers, made a false, material representation to Clarissa, the alleged "hearer," and (5) in the absence of any such evidence, whether the hearer, Clarissa, relied on the representation's truth. Clarion does not contest that its loan officers made the representation that the contractor would not be paid until its work was complete. Rather, Clarion suggests that at best, the evidence indicates this representation was made only to Shirley. Clarion argues that the absence of evidence that the representation was made directly to Clarissa or that the representation was reported by Shirley to Clarissa is fatal to Clarissa's fraudulent misrepresentation claim. We disagree with Clarion's narrow and constrained reading of the record.

In its brief and at oral argument, Clarion repeatedly emphasized that the trial transcript does not contain a precise, clear statement to the effect that Clarissa was in the kitchen with Shirley, Bredwell, and Hartman when Shirley asked about whether the contractor's payment would be held until the contractor's work was complete. Though this is true, Clarion ignores testimony from which the jury could reasonably have inferred this fact.

The only witness who testified at trial was Shirley. Shirley testified that on September 2, 2004, when Hartman and Bredwell came to Clarissa's home to speak with Clarissa about a possible loan, they had preliminary loan documents they wanted "[m]y mother to sign. We went into the kitchen and my mother, she wasn't feeling too good that day. She doesn't see that good, **so she asked Rob Hartman if it**

*was okay that I would sign for her, he stated yes."* This testimony clearly suggests that all of the parties went in to the kitchen and that once in the kitchen, Clarissa had a direct conversation with Hartman about Shirley signing documents on her behalf. Shirley was questioned about the signature on one of the documents she signed for her mother on September 2, 2004. Shirley testified as follows:

Q: If you'd look to the last page, would you, please? Is there a signature on that page?

A: Yes, there is.

Q: Do you recognize it?

A: Yes.

Q: Whose is it?

A: It's my mother's name, my signature.

Q: It says Clarissa Wade, but you signed it on there?

A: Yes.

Q: Did you sign that *at her direction?*

A: Yes.

Q: *She asked you?*

A: Yes.

(Emphasis added.) In addition, Shirley also testified that during the meeting with Hartman and Bredwell, both gentlemen accommodated Clarissa's limitations.

Q: Rob Hartman and Jeremy Bredwell, they were cordial and nice to you when they came out to the house, weren't they?

A: Yes.

Q: And they were nice and cordial to your mom?

A: Yes.

Q: And, in fact, they talked a little bit louder when addressing your mom because you told them she was hard of hearing?

A: Yes.

Q: And one of the things that they talked to you about which was kind of central to a lot of stuff you were talking about in your direct exam was certain payoffs that were required as a condition of the loan, correct?

A: Yes.

Q: They talked about conditions like payoff of credits, right?

A: Yes.

Q: And they also, there was specific discussions with you that you knew that K.C. Builders was going to be paid off at the close of the loan in the amount of $25,000; isn't that true?

A: At the close of the loan he told me—excuse me. My understanding is that no one will be paid until the work was done.

There would have been no point or reason for Hartman and Bredwell to "speak up" when talking to Clarissa unless Clarissa was in the room with Shirley during the meeting.

Because we view the evidence and all reasonable inferences in the light most favorable to the verdict and disregard any evidence to the contrary, we are left with the inescapable conclusion that the jury reasonably concluded that Clarissa was both present and heard the representations made by Hartman and Bredwell. *Keveney v. Mo. Military Acad.,* 304 S.W.3d 98, 104 (Mo. banc 2010). Clarion presented no evidence contradicting Shirley's testimony. In fact, other than its cross examination of Shirley, Clarion presented no evidence in this case at all. It has staked its appeal on its contention that *nothing* in Shirley's testimony could be viewed as confirming Clarissa's presence during the meeting where the representations critical to Clarissa's false misrepresentation claim were made. Clarion's position is without merit.

Clarion also argues that because Clarissa "did not testify at trial, or offer into evidence testimony from her deposition in this matter, there is no evidence of what she knew or relied on at the time she obtained the loan brokered by Clarion." Clarion is essentially arguing that because Clarissa failed to testify, she could not otherwise establish the requisite element of a fraudulent misrepresentation claim of her reliance on a misrepresentation. Clarion fails to mention that Clarissa did not testify because she was incapacitated by the time of trial and was incompetent to do so. In fact, *Clarion* filed a motion in limine specifically requesting that Clarissa not be permitted to appear at trial. In support of its motion Clarion stated that:

> Clarissa Wade should be prohibited from sitting in the courtroom, pursuant to Missouri S.Ct. Rule 52.05(k), as she has no probative value, except to inflame the passions of the jury, which is highly prejudicial to Clarion, as the court has already determined her to be "incapable by reason of mental or physical infirmity of ... properly caring for [her] own interests in [this] litigation."

Clarion offers no authority to support the invalid premise underlying its argument that Clarissa's reliance could only have been shown by Clarissa's testimony. To the contrary, at trial, Shirley was asked:

Q: You're complaining that the contractor was paid before he finished?

A: Yes.

Q: But you had a promise from the loan officers that that wouldn't happen?

A: Yes.

Q: **Did you count on that, did you rely on that?**

A: **Yes.**

(Emphasis added.) This "reliance" came from the representation made by Clarion's loan officers during their first meeting with Shirley and Clarissa. We have already established that the evidence supports the conclusion that Clarissa was present and heard the representations made by the loan officers.

■ At oral argument, Clarion's counsel suggested for the first time that this court must evaluate whether Clarissa's evidence of her presence during the first meeting with Hartman and Bredwell, and thus her evidence of having heard their representation about when the contractor would be paid, satisfied the "clear and convincing" burden of proof applied in fraudulent misrepresentation claims. *Kempton v. Dugan,* 224 S.W.3d 83, 87 (Mo.App. W.D. 2007). This argument is materially different from the argument raised by Clarion on appeal and asserted by Clarion in its motion for new trial. Up until the point of oral argument, Clarion has consistently contended that *no* evidence was presented that Clarissa either heard or relied on the representation made by Clarion's loan officers. Pursuant to this argument, the applicable "burden of proof" is irrelevant. On appeal, Clarion seemed to "hedge its bets," suggesting for the first time that even if some evidence that Clarissa heard and relied on the representation was presented, the evidence was not sufficient to satisfy the clear and convincing standard. This argument was not preserved and will be disregarded. *Vance Bros. v. Obermiller Constr. Servs., Inc.,* 181 S.W.3d 562, 564 n. 3 (Mo. banc 2006) (stating that in a jury tried case, an appellant must raise the alleged error in a motion for new trial in order to preserve the issue for appellate review); *Giles v. Riverside Transp., Inc.,* 266 S.W.3d 290, 296 (Mo.App. W.D.2008) (stating that the questions for decision on appeal are those stated in the points relied on; a question not there presented will be considered abandoned).

Clarion's contentions that *no* evidence was submitted to demonstrate that Clarissa either heard or relied on Clarion's loan officer's misrepresentation about payment to the contractor are without merit. There was uncontested evidence in the record to permit the jury to conclude that Clarissa both heard and relied on the misrepresentation made by Clarion's loan officers. The trial court did not error in submitting Clarissa's claim of fraudulent misrepresentation.

### Conclusion

For the aforementioned reasons, the judgment of the trial court is affirmed.[4]

All concur.

---

4. Wade's post-argument Motion for Attorney's Fees for Frivolous Appeal is denied.