

# In the
# Missouri Court of Appeals
## Western District

RANDY SPALDING,

        **Respondent,**

v.

**STEWART TITLE GUARANTY COMPANY,**

        **Appellant.**

**WD76369**

**OPINION FILED:**

**September 23, 2014**

---

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable Michael W. Manners, Judge**

Before Division Two: Victor C. Howard, P.J.,
James Edward Welsh, and Anthony Rex Gabbert, JJ.

Stewart Title Guaranty Company appeals the circuit court's judgment in favor of Randy

Spalding after a jury trial on his claims for breach of contract and vexatious refusal to pay in

regard to a title insurance policy. Stewart Title contends that the circuit court erred: (1) in

denying its motions for directed verdict and judgment notwithstanding the verdict because the

suit on the title insurance policy was time barred under the five year statute of limitations for

breach of contract, (2) in refusing to give its proposed instruction concerning its statute of

limitations defense, (3) in denying its motions for directed verdict and judgment notwithstanding

the verdict because Spalding failed to make a submissible case as to the existence and amount of the damages for the breach of contract, (4) in admitting evidence from appraiser Brian Reardon regarding the damages sustained from the title defect under the policy, and (5) in giving Instruction No. 7, which defined the measure of damages in accordance with the highest and best use of the property. Further, Stewart Title asserts that, if this court reverses the circuit court's judgment regarding the breach of contract claim, then the circuit court necessarily erred in failing to grant Stewart Title's motions for directed verdict, judgment notwithstanding the verdict, or new trial on the vexatious refusal to pay claim. We affirm.

Viewing the evidence in the light most favorable to the judgment, the evidence established that, in 2003, Spalding contracted to buy approximately 419 acres of property in the City of Lake Winnebago, Cass County, Missouri. The land was bound by 167th Street, the existing Lake Winnebago Dam, and Missouri Route 291, and much of the land is in a federally-designated flood area. Spalding and his wife formed an entity named Spalding Land Company (SLC) to take title to the property in February 2003. The land was in receivership at the time of the acquisition, and SLC acquired the land for $1,510,000.

Stewart Title issued a policy of title insurance to SLC on February 12, 2003, in the amount of $1.7 million, insuring the property as described in Schedule A of the policy. Pursuant to the policy, Stewart Title insured against loss or damage sustained or incurred by SLC by reason of ""[t]itle to the estate or interest described in Schedule A being vested other than as stated therein;" "[a]ny defect in or lien or encumbrance on the title;" "[u]nmarketability of the title;" and "[l]ack of a right of access to and from the land." The policy stated that it was "a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant" with liability not to exceed the lesser of "(i) the Amount of Insurance stated in

2

Schedule A; or, (ii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy."

After purchasing the land, Spalding began talking with various people about developing the land. In 2005, Matt Bowen, John Bowen, and Scott Westlake created a new company named South Winnebago Partners (SWP). SWP began working with Spalding and SLC on plans for developing the property. The parties developed a plan to expand the existing Lake Winnebago into the flood area on the property to create new lake front lots and traditional lots with lake-access rights.[1] In 2007, pursuant to an amended and restated operating agreement, SWP became one of the two members of SLC, along with Spalding. SWP also became the manager of SLC. The agreement recognized that the property was Spalding's contribution to SLC and that "services" were SWP's contribution to SLC.

At some point, SLC sought (and later eventually obtained) a permit from the U.S. Army Corps of Engineers to partially remove the existing dam, to construct a new dam and spillway, and to expand Lake Winnebago. SLC also contracted with HNTB to be the land planner and with Olsson and Associates to perform engineering work. Further, SWP acquired options to purchase on surrounding parcels of land that might be needed for the project. Moreover, SLC presented its plan to the Lake Winnebago Homeowners Association and the City of Lake Winnebago, and both entities were supportive of the plan.

---

[1]SLC had two different plans for development of the property. The 2006 Plan called for development of between 354 to 365 lots. The 2007 Plan called for the development of 154 lake front lots and 231 traditional lots with lake access rights.

3

Things appeared to be progressing with the development plan until January 2006 when Spalding received a telephone call from Paul Estes. Estes claimed that he owned a one acre tract of land at the bottom of the lake proposed by SLC. Realizing that Estes's claim could preclude the development of the lake, Spalding contacted Coffelt Title, the agent for Stewart Title which had issued the title insurance policy to SLC. Coffelt Title responded with a letter to Spalding, dated March 21, 2006, acknowledging Spalding's claim and advising Spalding to contact Stewart Title regarding his claim.

As it turned out, both SLC and Estes held deeds showing that they owned this one-acre tract of land. Both SLC and Estes had purchased title insurance from Stewart Title, and both Estes and Spalding contacted Stewart Title about a possible title defect. From April 2006 until mid-June 2006, Stewart Title conducted an investigation to determine whether SLC or Estes possessed good title to the one-acre tract of land. On June 16, 2006, Stewart Title completed its investigation and determined that Estes owned the one-acre tract and that SLC did not. On July 15, 2006, Spalding contacted Stewart Title, and SLC made a claim under the title insurance policy.

After discovering that SLC's title was defective, Stewart Title made an election under paragraph 6 of the policy and chose to pay the loss suffered by SLC as a result of the defect. Paragraph 6 provides:

> **6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.**
>
> In case of a claim under this policy, the Company shall have the following additional options:
>
> (a) To Pay or Tender Payment of the Amount of Insurance.
>
> . . . .

4

(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant

(i) to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs (b)(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

Stewart Title informed SLC that "[t]he loss under the policy is measured as the 'difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.'" Stewart Title, therefore, claimed that SLC's loss "would be the difference in value between the property with the 1 acre tract owned by Estes and the value of the property without that 1 acre tract." Stewart Title told SLC that it would commission an appraisal to determine this difference.

On July 3, 2007, Stewart Title sent a letter to SLC's counsel indicating that it completed its appraisal and that such appraisal "measured the diminution in value at $10,000." Along with its letter, Stewart Title enclosed a check in the amount of $10,000 to fully resolve the claim.

On July 12, 2007, SLC returned Stewart Title's check and informed Stewart Title that $10,000 did not adequately compensate SLC for its loss. The letter said:

5

> [W]e do believe that my client's loss is the difference in value of the land as insured, including the one (1) acre at issue, and the value of the land excluding the one (1) acre. Without the one (1) acre which is in question, the proposed Lake expansion cannot go forward, and Spalding Land Company LLC will suffer loss in the value of its land far greater than the amount of the insurance policy. With the defect corrected, and the one (1) acre in question included in the Spalding Land Company LLC tract, there would not be a loss to Spalding Land Company LLC. We do not believe that the appraisal provided accurately values the property with and without that one (1) acre.

SLC continued to suggest that, in lieu of paying the loss suffered by SLC as a result of its defective title, Stewart Title purchase the one-acre tract from Estes. Estes had requested payment of $387,000. To facilitate this approach, Spalding purchased and repeatedly renewed an option to purchase the tract from Estes. However, Stewart Title continued to insist that SLC's loss was only $10,000.

With the dispute unresolved with Stewart Title, SLC ceased operations and assigned this claim along with the land in question to Spalding. On June 9, 2011, Spalding filed suit against Stewart Title asserting claims for breach of contract and vexatious refusal to pay in regard to a title insurance policy. After a jury trial, the circuit court entered an amended judgment for Spalding in the amount of $1,100,000 on the policy, penalties in the amount of $110,150, and attorney fees in the amount of $81,000. Stewart Title appeals.

In its first point on appeal, Stewart Title contends that the circuit court erred in denying its motions for directed verdict and judgment notwithstanding the verdict because the suit on the title insurance policy was time barred under the five year statute of limitations for breach of contract. Stewart Title asserts that the title insurance policy is a contract of indemnity that contains no unconditional promise to pay as required to bring this case within the ten year statute of limitations.

6

The running of the applicable statute of limitations is an affirmative defense. The party asserting the affirmative defense of the running of the applicable statute of limitations bears the burden of not only pleading it but also proving it as a matter of law. *Townsend v. E. Chem. Waste Sys.*, 234 S.W.3d 452, 462 (Mo. App. 2007). "Thus, unless the party asserting the affirmative defense of the running of the statute of limitations proves its defense, as a matter of law," the circuit court does not err in denying the party's motion's for directed verdict or judgment notwithstanding the verdict. *Id.*; *Fleshner v. Pepose Vision Inst.*, 304 S.W.3d 81, 95 (Mo. banc 2010).

Stewart Title asserts that, pursuant to section 516.120(1), RSMo 2000, "[a]ll actions upon contracts, obligation or liabilities" must be brought within five years. If, however, the action is upon any writing for the payment of money, the action must be commenced within ten year. §516.110(1), RSMo 2000. Stewart Title contends that the five-year statute of limitations under section 516.120(1) applies in this case because the title insurance policy at issue is a contract of indemnity that contains no unconditional promise to pay as required to invoke the ten-year statute of limitations.

Regardless of whether the five-year or ten-year statute of limitations applies in this case, the facts established that Spalding filed his suit against Stewart Title less than five years after Stewart Title breached the title insurance policy, giving rise to the cause of action. "[I]n and action for breach of contract, the statute of limitations begins to run when the right to sue thereupon arises." *Loeffler v. City of O'Fallon*, 71 S.W.3d 638, 642 (Mo. App. 2002) (citing *Ballwin Plaza Corp. v. H.B. Deal Constr. Co.*, 462 S.W.2d 687 (Mo. 1971)). Once Stewart Title determined that SLC's title was defective, it acted consistent with its contractual obligations. It made an election to pay SLC for its "actual monetary loss or damage." This was Stewart Title's

7

right under the policy. It was not until July 3, 2007, when Stewart Title sent a letter to SLC's counsel indicating that it completed its appraisal of the property and included a check for $10,000 to fully resolve the claim under the title insurance policy that Spalding's claim for breach of contract accrued. The claim for breach of contract did not accrue until Stewart Title allegedly failed or refused to adequately compensate SLC for "the actual monetary loss or damage" as required under the title insurance policy. Until that time, SLC had no reason to sue Stewart Title. *Cf. Loeffler*, 71 S.W.3d at 643 (cause of action for breach of contract accrued, at the earliest, when homeowner received letter from city's insurance company denying liability for damages to homeowner's property not when plaintiff became aware that her property was damaged). Spalding filed his petition with the circuit court asserting its claim against Stewart Title for breach of contract on June 9, 2011. Thus, Spalding's claims would have been timely under both the five and ten-year statute of limitations in that it was filed less than five years after Stewart Title's letter of July 3, 2007.

To the extent that Stewart Title argues that the statute of limitation began to run at the moment that SLC learned of the possible title defect because that is when damages were capable of ascertainment,[2] that argument also fails. The mere existence of a possible title defect did not give rise to any cause of action against Stewart Title in this case. The title insurance policy at issue did not guarantee SLC good title or protect SLC against potential claims. Rather, the

_____

[2]Section 516.100, RSMo 2000, provides:

> Civil actions, other than those for the recovery of real property, can only be commenced within the periods prescribed in the following sections, after the causes of action shall have accrued; provided, that for the purposes of sections 516.100 to 516.370, the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained.

policy indemnified SLC against "actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of the matter insured against by the policy."

Although SLC was put on notice in early 2006 about Estes's possible ownership claim to the one-acre tract of land, it took until June 16, 2006, for Stewart Title to complete its investigation and determine that an actual defect existed with SLC's title to the property. Until that determination was made, SLC did not suffer an "actual monetary loss or damage" and could not seek indemnification from Stewart Title.[3] In a case involving a contract of indemnity against loss, the claim accrues when the indemnitee sustains actual loss. *Burns & McDonnell Eng'g Co., Inc. v. Torson Constr. Co., Inc.*, 834 S.W.2d 755, 758 (Mo. App. 1992). Thus, the earliest that damages could have possibly been ascertained was on June 16, 2006. Until that date, SLC did not sustain any actual loss, which would trigger Stewart Title's duty to indemnify. Spalding filed his petition with the circuit court asserting its claim against Stewart Title for breach of contract on June 9, 2011. Thus, Spalding's claim would have been timely under both the five and ten-year statute of limitations if the June 16, 2006, date was truly the date that the damages could have been ascertained. But, as stated previously, SLC had no reason to sue Stewart Title until, July 3, 2007, when Stewart Title allegedly failed or refused to adequately compensate SLC for "the actual monetary loss or damage" as required under the title insurance policy.

Moreover, to the extent that Stewart Title asserts in its second point on appeal that the circuit court erred in refusing to give Stewart Title's proposed instruction to the jury concerning

---

[3]Stewart Title relies on *Hopmeirer v. First Am. Title Ins. Co.*, 856 S.W.2d 387, 388 (Mo. App. 1993), in support of its contention that the statute of limitations began to run once Spalding and SLC were on notice of the potential title defect. In *Hopmeirer*, the title insurance policy at issue guaranteed the policyholder good title. Accordingly, the policy was breached when the policyholder discovered that he did not possess good title. In this case, the breach of contract did not occur until Stewart Title failed to pay the "actual monetary loss or damage."

9

its statute of limitations defense, its point is without merit. "Whether a jury was properly instructed is a question of law this Court reviews de novo." *Hayes v. Price*, 313 S.W.3d 645, 650 (Mo. banc 2010). Stewart Title asserts that the evidence supported the submission of the instruction in that a jury could have reasonably found that the injury and substantial damages were capable of ascertainment more than five years prior to the suit when SLC learned of Estes's title defect in January 2006, recognized it as a problem, and took steps to contact Stewart Title's agent, Coffelt Title, about the possible claim. As discussed previously, even if the five-year statute of limitations applied in this case, the statute of limitations did not begin to run when Spalding became aware of the possible title defect; rather, it began to run when Stewart Title failed or refused to adequately compensate Spalding for "the actual monetary loss or damage" as required under the title insurance policy. "To be charged to the jury, an issue submitted in an instruction 'must be supported by substantial evidence from which the jury reasonably could find such issue.'" *Kauzlarich v. Atchison, Topeka & Santa Fe Ry. Co.*, 910 S.W.2d 254, 258 (Mo. banc 1995) (citation omitted). The circuit court did not err in refusing to submit Stewart Title's instruction regarding its statute of limitations defense.

In two of its points on appeal, Stewart complains about the insufficiencies of the testimony of Spalding's appraiser in regard to damages. In one point, Stewart Title asserts that the circuit court erred in denying its motions for directed verdict and judgment notwithstanding the verdict because Spalding failed to make a submissible case as to the existence and amount of the claimed damage for breach of contract. Stewart Title argues that Spalding's only evidence of damages came from his appraiser, Brian Reardon and contends that the circuit court should have granted its motions for directed verdict and judgment notwithstanding the verdict because (1) Reardon's appraisal was based on a lake development plan that Spalding and SLC had

10

abandoned, (2) Reardon's appraisal was based upon a plan that included uninsured parcels of land that were never owned by SLC or Spalding, and (3) Reardon provided no basis for a rational and non-speculative estimate of damage arising from the title defect under the policy. In another point on appeal, Stewart Title asserts that the circuit court erred in admitting the testimony from Reardon regarding damages because his testimony was inadmissible as speculative, unreliable, and unsupported by the facts because it was based on assumptions contrary to the facts in evidence, including "the existence of a governmental permit to create a lake development, title insurance coverage and ownership of all required property, and the availability of financing."

We review the circuit court's denial of a motion for directed verdict and denial of a motion for judgment notwithstanding the verdict under the same standard. *Holmes v. Kansas City Mo. Bd. of Police Comm'rs ex rel. Its Members*, 364 S.W.3d 615, 621 (Mo. App. 2012). "This Court must determine whether the plaintiff presented a submissible case by offering evidence to support every element necessary for liability." *Fleshner*, 304 S.W.3d at 95. "Evidence is viewed in the light most favorable to the jury's verdict, giving the plaintiff all reasonable inferences and disregarding all conflicting evidence and inferences." *Id*. We "will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion." *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 457 (Mo. banc 2006). Moreover, "[i]n general, the trial court has discretion to admit or exclude expert testimony; absent a showing of discretional abuse, we will not interfere with such decisions on appeal." *Thomas v. Festival Foods*, 202 S.W.3d 625, 627 (Mo. App. 2006). "However, the issue of whether an expert's opinion is supported by facts in evidence is a question of law, reviewed *de novo* and without deference to the trial court's ruling." *Id*.

11

Spalding presented evidence of damages through Brian Reardon, a licensed appraiser with Bliss & Associates. Reardon conducted an appraisal of the land at issue and determined that the estimate of damages as of February 15, 2007, was:

| | |
|---|---|
| Insured Property | $5,700,000 |
| Insured Property Subject to Defect | $1,600,000 |
| Damages | $4,100,000 |

This valuation stemmed from the proposed lake development that was in progress when SLC learned of the title defect. Stewart Title asserts that, because Reardon reached his damage opinion by considering and valuing a 2007 lake development plan with 385 lots that included parcels never insured under the title insurance policy and never owned by Spalding or SLC, the evidence failed to provide a reasonable basis for a fact finder to determine what, if any, portion of Reardon's opinion establishes or quantifies damages attributable to the title defect in the insured property.

As a general rule, however, "questions as to the sources and bases of the expert's opinion affect the weight, rather than the admissibility of the opinion, and are properly left to the jury." *Glaize Creek Sewer Dist. of Jefferson Cnty. v. Gorham*, 335 S.W.3d 590, 593 (Mo. App. 2011) (citation and internal quotation marks omitted). "Any weakness in the factual underpinnings of the expert's opinion or in the expert's knowledge goes to the weight that testimony should be given and not its admissibility." *Mathes v. Sher Express, L.L.C.*, 200 S.W.3d 97, 111 (Mo. App. 2006) (citation and internal quotation marks omitted). "In general, the expert's opinion will be admissible, unless the expert's information is so slight as to render the opinion fundamentally unsupported." *Id.* (citation and internal quotation marks omitted).

Thus, to the extent that Stewart Title contends that Reardon's damage estimates were based in part upon the inclusion of uninsured and nonowned parcels of land in the 2007 lake

12

development plan, such was an issue for the jury to weigh in considering Reardon's opinion on valuation of the property. Moreover, the jury heard evidence that SWP, SLC's manager, had acquired options to purchase these parcels of land and that SWP could have exercised its options if the development plan had gone forward. Further, Stewart Title cross-examined Reardon extensively about whether the inclusion of nonowned parcels of land would in any way change his appraisal, and Reardon acknowledged that it "could." Reardon agreed that, if Spalding had to purchase property from others to construct his lake plan, it could change the costs in his appraisal report. Thus, Stewart Title pointed out the shortcomings in Reardon's testimony, and it was up to the jury to weigh Reardon's testimony.

Stewart Title also contends that, because Spalding testified at trial that he now intends to utilize a different lake development plan than the plan considered by Reardon, Reardon's valuation of damages based upon the old development plan is no longer sufficient evidence of the damages suffered by Spalding as a result of the breach of the title insurance policy. In Reardon's appraisal, he assumed the lake development plan would have 154 "lake lots" and 231 "traditional lots," which was the plan that SLC was proceeding under at the time that Reardon made his appraisal. Although Spalding's testified at trial that he now intended to develop the property under a plan, which called for the development of 345 and 365 lots, the jury still had before it Reardon's testimony regarding his appraisal of the land as a lake development plan under the plan that SLC was proceeding under at the time of the appraisal. As stated earlier "questions as to the sources and bases of the expert's opinion affect the weight, rather than the admissibility of the opinion, and are properly left to the jury." *Glaize Creek Sewer Dist.,* 335 S.W.3d at 593 (citation and internal quotation marks omitted). "Any weakness in the factual underpinnings of the expert's opinion or in the expert's knowledge goes to the weight that

13

testimony should be given and not its admissibility." *Mathes*, 200 S.W.3d at 111 (citation and internal quotation marks omitted). Stewart Title had the opportunity and did cross-examine Reardon about whether his valuation would change if the lake development plan changed.

Stewart Title further contends that Reardon's opinion was based upon assumptions contrary to the facts in evidence, including "the existence of a governmental permit to create a lake development, title insurance coverage and ownership of all required property, and the availability of financing." As of the effective date of Reardon's appraisal, numerous steps had been taken on the lake development plan. The plan had been presented to the City of Lake Winnebago and the Lake Winnebago Homeowners Association, and those entities had expressed support for the development. Although Reardon testified at trial that he made the assumption that Spalding or SLC could have obtained a permit for the lake development plan, in the appraisal he specifically stated:

> The US Army Corps of Engineers issued a joint public notice with the Missouri Department of Natural Resources, Water Pollution Control Program in order to collect comments in deciding whether to grand [sic] Section 401 water quality certification. This public notice was issued on March 23, 2007, which is after the effective date of this report, but is tangible evidence that permitting process was well along as of the effective date.

Reardon acknowledged that he made the assumption that Spalding owned or had the right to buy the property shown in the development and that he based that assumption on what Spalding told him and upon legal descriptions of the property that were given to him. In addition, as noted previously, the evidence established that SWP, SLC's managing member, had acquired options to purchase the parcels surrounding the land that might be needed for development. Further, Reardon testified that it made no difference in his appraisal whether it was financially possible for Spalding or SLC to proceed with the lake development plan at the time of his appraisal

14

because his market analysis established that the development plan was financially feasible. He explained that the land could have been sold to someone else to proceed with the development. All of these assumptions may have been weaknesses in the factual underpinnings of Reardon's opinion, but such weaknesses go to the weight of his testimony and not to its admissibility. Stewart Title had the opportunity to cross-examine Reardon extensively about his assumptions and did so, but the record establishes that Reardon's assumptions were not so speculative, unreliable, and unsupported by the evidence as to render his opinion inadmissible.

Given Reardon's testimony, Spalding made a submissible case as to the existence and amount of claimed damages for breach of contract. The circuit court, therefore, did not err in denying Stewart Title's motions for directed verdict and judgment notwithstanding the verdict. Moreover, the circuit court did not err in admitting Reardon's testimony regarding the damages sustained from the title defect under the policy.

In its next point, Stewart Title asserts that the circuit court erred in giving the jury Instruction No. 7 and in denying its motion for new trial because the instruction erroneously defined the measure of damages in accordance with the highest and best use of the property under condemnation law rather than the benefit of the bargain under contract law. Stewart Title contends that, because the policy specified the applicable measure of damages as "actual monetary loss or damage" based on the property "as insured," it was improper to base damages on a nonexistent lake development.

"Whether a jury is properly instructed is a matter of law subject to *de novo* review by this court." *Syn, Inc. v. Beebe*, 200 S.W.3d 122, 128 (Mo. App. 2006). To reverse on grounds of instructional error, the party challenging the instruction must show that the instruction misled, misdirected, or confused the jury. *Dhyne*, 188 S.W.3d at 459. Further, "[t]he party offering the

15

erroneous instruction has the burden of showing that the erroneous instruction 'created no substantial potential for prejudicial effect.'" *Gorman v. Wal-Mart Stores, Inc.*, 19 S.W.3d 725, 730 (Mo. App. 2000) (citation omitted). It is within the province of this court to determine the prejudicial effect of the erroneous instruction. *Id.*

The instruction given to the jury provided:

> If you find in favor of Plaintiff, you must award Plaintiff such sum as you believe was the difference between the fair market value of the entire insured property at the time the title defect was discovered and the fair market value of the insured property subject to the title defect. In determining the fair market value of the property, you may consider evidence of the value of the property including the highest and best use to which the property reasonably may be applied or adapted, the value of the property if freely sold on the open market, and generally accepted appraisal practices. You may give such evidence the weight and credibility you believe are appropriate under the circumstances. If you find that Plaintiff failed to mitigate damages as submitted in Instruction No. 8, in determining Plaintiff's total damages you must not include those damages that would not have occurred without such failure.

> The phrase "fair market value" as used in this instruction means the price that the insured property in question would bring when offered for sale by one willing but not obliged to sell it and when bought by one willing or desirous to purchase it but who is not compelled to do so.

The instruction is a modified version of MAI No. 9.02, which is the standard damage instruction for eminent domain cases.

Although Stewart Title contends that the measure of damages used in condemnation cases does not apply to cases involving a breach of title insurance policy, the Missouri Supreme Court has held otherwise. In *Fohn v. Title Insurance Corporation of St. Louis*, 529 S.W.2d 1, 4 (Mo. banc 1975), the Missouri Supreme Court held that it was appropriate to borrow from the eminent domain instruction, MAI No. 9.02, in measuring an insured's damages under a policy of title insurance. Moreover, this court in *Davis v. Stewart Title Guaranty Company*, 726 S.W.2d 839,

16

853 (Mo. App. 1987), relying upon *Fohn*, affirmed the use of an instruction modified from MAI No. 9.02 in a case alleging breach of a title insurance policy and vexatious refusal to pay.

Stewart Title asserts, however, that the measure of damages developed for condemnation cases based on the highest and best use do not apply in this case where the policy defines the measure of damages. Pursuant to the policy, Stewart Title insured against loss or damage sustained or incurred by SLC by reason of ""[t]itle to the estate or interest described in Schedule A being vested other than as stated therein;" "[a]ny defect in or lien or encumbrance on the title;" "[u]nmarketability of the title;" and "[l]ack of a right of access to and from the land." The policy stated that it was "a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant" with liability not to exceed the lesser of "(i) the Amount of Insurance stated in Schedule A; or, (ii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy."

Stewart Title claims that the title insurance policy contains express limitations on the measure of damage to the property "as insured" and a requirement of "actual monetary loss or damage." Stewart Title, therefore, contends that the policy language prohibits consideration of the highest and best use of the insured property. The policy language, however, is silent on the issue. The "as insured" language that Stewart Title emphasizes refers to the condition of the title and not to the property's use.[4] Stewart Title insured a fee simple estate in land having the legal description set forth in the policy's Schedule A. Thus, in the event that the policyholder is found to possess some lesser interest, the policyholder is entitled to damages as measured by the

---

[4]The same policy could be used to insure a life estate or a long term leasehold interest.

17

difference in the value of the insured estate or interest as insured (i.e. fee simple in land having the legal description set forth in Schedule A) and the value of the insured estate or interest subject to the defect." The policy says nothing about how this valuation is to be performed. Thus, to the extent that Stewart Title contends that the property "as insured" under the policy is undeveloped property, "not a lakefront-style resort complete with residential lots and amenities," its contention is without merit.

The jury was instructed that, if it found in favor of the Plaintiff, that it had to award "Plaintiff such sum as you believe was the difference between the fair market value of the entire insured property at the time the title defect was discovered and the fair market value of the insured property subject to the title defect." That indeed was the measure of damages. The instruction merely informed the jury that, in determining the fair market value of the property, the jury could consider "evidence of the value of the property including the highest and best use to which the property reasonably may be applied or adapted, the value of the property if freely sold on the open market, and generally accepted appraisal practices." While such language may very well be surplusage and perhaps better left to argument, it is nonetheless an accurate statement of the law. It could neither mislead nor confuse a jury.

Where, as here, no specific MAI instruction is directly applicable, "an MAI must be modified to fairly submit the issues in a particular case, or where there is no applicable MAI so that an instruction not in MAI must be given," the instruction given or modified "shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts." Rule 70.02(b). We acknowledge that the instruction given to the jury may not have been a model of simplicity. In *Fohn*, the Missouri Supreme Court, in considering the measure of damages in a title insurance defect case, noted that the issue "is one having a

18

fixed answer in other areas calling for a determination of damages suffered by the loss of a

portion of a tract of land." 529 S.W.2d at 4. The *Fohn* court found:

> [I]n the area of eminent domain the pattern instruction to guide a jury in awarding damages (where part of property is taken) may be found in MAI-9.02. It, in part, provides: "You must award . . . such sum as you believe is . . . the difference between the fair market value of . . . (the) whole property immediately before the taking . . . and the value of . . . (the) remaining property immediately after such taking . . ." The "difference" thus found is accepted as the "loss" suffered by the owner of the land. The defendant has not suggested, nor has own research revealed any persuasive reason why the same approach should not be applicable in this instance. Not only does it appear to be the most fair and accurate method, but its adoption in title insurance cases would contribute toward uniformity in the area of assessment of damages.

*Id*. The MAI No. 9.02 eminent domain instruction in effect at the time the *Fohn* court issued its

opinion provided:

> You must award defendant such sum as you believe is [was] the difference between the fair market value of defendant's whole property immediately before the taking [on (*insert date of appropriation*)] and the value of defendant's remaining property immediately after such taking, which difference in value is the direct result of the taking and of the uses which plaintiff has the right to make of the property taken.[5]

Such instruction utilized in a title insurance defect case may be a better example of a Rule 70

modification than the instruction approved herein. But, as we stated earlier, the instruction given

---

[5]The 2012 Revision of MAI No. 9.02, which is the instruction that Spalding modified for Instruction No. 7, now provides:

> You must award defendant such sum as you believe [was] is the difference between the fair market value of the entire property [immediately before the taking on (*insert date of appropriation*)] and the fair market value of the remaining [burdened] property [immediately after the taking]. In determining the fair market value of defendant's property, you may consider evidence of the value of the property including [comparable sales, capitalization of income, replacement cost less depreciation,] the highest and best use to which the property reasonably may be applied or adapted, the value of the property if freely sold on the open market, and generally accepted appraisal practices. You may give such evidence the weight and credibility you believe are appropriate under the circumstances.

19

to the jury in this case was an accurate statement of the law, and it did not mislead nor confuse a jury.

Moreover, in this case, Spalding's expert testified about the highest and best use of the property being the proposed lake development. Even Stewart Title's claim counsel acknowledged that Stewart Title's appraiser considered the property's highest and best use as a mixed use purpose with commercial and single-family residential. Based upon the evidence presented, it was for the jury to determine fair market value, which was defined as "the price that the insured property in question would bring when offered for sale by one willing but not obliged to sell it and when bought by one willing or desirous to purchase it but who is not compelled to do so." In making its determination about fair market value, the instruction merely allowed the jury, but did not require it, to consider and weigh the evidence concerning the highest and best use of the property. The circuit court, therefore, did not err in giving the jury Instruction No. 7 and in denying Stewart Title's motion for new trial.

We, therefore, affirm the circuit court's judgment in favor of Spalding on his claims for breach of contract and vexatious refusal to pay in regard to the title insurance policy.[6]

/s/ JAMES EDWARD WELSH
James Edward Welsh, Judge

All concur.

---

[6]We need not address Stewart Title's last point on appeal, in which it asserted that, if we reverse the circuit court's judgment regarding the breach of contract claim, then we would necessarily have to reverse the circuit court's judgment on the vexatious refusal to pay claim. As we are affirming the circuit court's judgment on the breach of contract claim, it is unnecessary for us to consider this point.

20